JODI LINKER
Federal Public Defender
Northern District of California
GABRIELA BISCHOF
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:          Gabriela_Bischof@fd.org

Counsel for Defendant Arteaga

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 22–101 WHO |
| Plaintiff, | **DEFENDANT'S NOTICE, MOTION, AND MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS** |
| v. | |
| WILMER ARTEAGA, | **Court:**           Courtroom 2, 17th Floor |
| Defendant. | **Hearing Date:**  November 3, 2022 |
| | **Hearing Time:**  1:30 p.m. |

**PLEASE TAKE NOTICE** that on November 3, 2022 at 1:30 p.m. in the courtroom of the Honorable William H. Orrick, or as soon thereafter as the matter may be heard, counsel for Defendant Wilmer Arteaga will move the Court to suppress all fruits of the unlawful seizure and search of his person on November 9, 2021. The motion is based on this notice and motion, the following memorandum of points and authorities and accompanying exhibits, the Constitution of the United Stated of America, all applicable statutory and case law, and such evidence and arguments as may be presented at the hearing of this motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... i

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

**BACKGROUND** ................................................................................................................ 1

**ARGUMENT** ...................................................................................................................... 3

    I.     The Seizure and Searches Were Conducted Without a Warrant and Are Presumptively Illegal .......................................................................................................................... 3

          A.     The Government Bears the Burden of Proving the Warrantless Seizure and Subsequent Search were Legal. .............................................................. 3

          B.     Mr. Arteaga Was Seized When Officer O'Brien and Officer Sarcos Forcibly Took Him to the Ground and Handcuffed Him ...................................... 4

          C.     Mr. Arteaga Was Not Merely Seized But Was Actually Arrested When Officer O'Brien and Officer Sarcos Forcibly Took Him to the Ground and Handcuffed Him ....................................................................................................... 5

    II.    The Government Cannot Carry Its Burden to Prove the Officers' Warrantless Seizure, Arrest, and Subsequent Searches Were Lawful and All Fruits of Those Fourth Amendment Violations Must Be Suppressed ...................................................... 7

          A.     The Warrantless Arrest And/Or Seizure, Frisk, and Subsequent Searches Were Unconstitutional .......................................................................... 8

               1.     Mere Presence Is Insufficient To Establish Probable Cause ................... 8

               2.     The Description of the Suspect Was Too Vague to Establish Probable Cause or Reasonable Suspicion ............................................................... 9

               3.     Where the Detained Person Does Not Match the Description of the Suspect, Seizure Violates the Constitution ............................................. 10

               4.     Any Suspicion Dissipated As Soon As Police Viewed Mr. Arteaga Up Close and Failed to Locate a Weapon After the Frisk ........................... 11

CONCLUSION ...................................................................................................................... 13

1

TABLE OF AUTHORITIES

2

**Federal Cases**

3

*Allen v. City of Portland*,

4
   73 F.3d 232 (9th Cir. 1995) ................................................................. 5, 8

5
*Brown v. City of Oneonta*,
   221 F.3d 329 (2d Cir.2000) .................................................................. 9

6
*California v. Hodari D.*,

7
   499 U.S. 621 (1991) ............................................................................ 4

8
*Dancy v. McGinley*,
   843 F.3d 93 (2d Cir. 2016) ................................................................ 10

9
*Dunaway v. New York*,

10
   442 U.S. 200 (1979) ............................................................................ 8

11
*Florida v. Bostick*,
   501 U.S. 429 (1991) ............................................................................ 4

12

13
*Goodson v. Corpus Christi*,
   202 F.3d 730 (5th Cir. 2000) ............................................................ 10

14
*Grant v. City of Long Beach*,

15
   315 F.3d 1081 (9th Cir.2002) .............................................................. 9

16
*Illinois v. Wardlow*,
   528 U.S. 119 (2000) ............................................................................ 7

17

18
*Moreno v. Baca*,
   431 F.3d 633 (9th Cir. 2005) ............................................................ 11

19
*Nicholson v. City of Los Angeles*,
   935 F.3d 685 (9th Cir. 2019) ............................................................ 11

20

21
*Sialoi v. City of San Diego*,
   823 F.3d 1223 (9th Cir. 2016) .......................................................... 10

22
*Terry v. Ohio*,

23
   392 U.S. 1 (1968) ............................................................................ 7, 8

24
*Thomas v. Dillard*,
   818 F.3d 864 (9th Cir. 2016) .............................................................. 7

25

26
*United States v. Bautista*,
   684 F.2d 1286–89 (9th Cir.1982) ....................................................... 5

27
*United States v. Buckner*,

28
   179 F.3d 834 (9th Cir. 1999) .............................................................. 8

*United States v. Colin*,
　314 F.3d 439 (9th Cir. 2002) ........................................................................ 8

*United States v. Del Vizo*,
　918 F.2d 821 (9th Cir. 1990) ........................................................................ 5

*United States v. Delgadillo-Velasquez*,
　856 F.2d 1292 (9th Cir. 1988) ...................................................................... 5

*United States v. Grandberry*,
　730 F.3d 968 (9th Cir. 2013) ...................................................................... 11

*United States v. Jacobs*,
　715 F.2d 1343 (9th Cir. 1983) ...................................................................... 5

*United States v. Job*,
　871 F.3d 852 (9th Cir. 2017) ........................................................................ 4

*United States v. Lopez*,
　482 F.3d 1067 (9th Cir. 2007) ............................................................... 11, 12

*United States v. Mendenhall*,
　446 U.S. 544 (1980) ...................................................................................... 4

*United States v. Ortiz- Hernandez*,
　427 F.3d 567 (9th Cir. 2005) ...................................................................... 11

*United States v. Pinion*,
　800 F.2d 976 (9th Cir. 1986) .................................................................... 5, 8

*United States v. Ricardo D.*,
912 F.2d 337 (9th Cir.1990) ........................................................................ 10

*United States v. Rousseau*,
　257 F.3d 925 (9th Cir. 2001) ........................................................................ 5

*United States v. Scott*,
　705 F.3d 410 (9th Cir. 2012) ..................................................................... 3, 4

*United States v. Sigmond–Ballesteros*,
　285 F.3d 1117 (9th Cir. 2001) ...................................................................... 9

*United States v. Thomas*,
　863 F.2d 622 (9th Cir. 1988) ...................................................................... 10

*United States v. Vasey*,
　834 F.2d 782 (9th Cir. 1987) ........................................................................ 4

*United States v. Washington*,
　387 F.3d 1060 (9th Cir. 2004) ...................................................................... 4

*United States v. Washington*,
　490 F.3d 765 (9th Cir. 2007) ........................................................................ 4

*Washington v. Lambert*,
    98 F.3d 1181 (9th Cir. 1996) ........................................................................ 5, 6

*Wong Sun v. United States*,
    371 U.S. 471 (1963) ...................................................................................... 7

*Ybarra v. Illinois*,
    444 U.S. 85 (1979) ........................................................................................ 8

**Other**

U.S. Const. amend. IV ........................................................................................ 3

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

On November 9, 2021, San Francisco Police Department ("SFPD") Officers were searching the Tenderloin for a black male adult who fired at least one shot in a road rage incident that evening, as well as the white BMW sedan involved. Instead of locating that suspect, they forcibly seized, frisked, and -after finding no weapon- arrested and searched Wilmer Arteaga,[1] a light skinned Hispanic male standing on the sidewalk near a white BMW in another part of the Tenderloin. The warrantless seizure, frisk, arrest, and search of Mr. Arteaga were not supported by reasonable suspicion or probable cause because the nexus between Mr. Arteaga and the suspect vehicle established mere presence at a crime scene at best, the description of the suspect sought was insufficiently particular, and in any event, Mr. Arteaga did not match the description of the suspect. Finally, by the time police arrested Mr. Arteaga, any suspicion they had at the outset of the encounter had fatally dissipated. Accordingly, the Court should grant the motion and suppress all evidence obtained as a result of the unlawful seizures and searches of Mr. Arteaga.

## BACKGROUND[2]

On November 9, 2021, at approximately 6:33 p.m., SFPD Sergeants Delaney and Kasper were traveling on Turk Street where it intersects with Larkin Street when their attention was drawn to two vehicles, a white BMW and dark-colored SUV, that appeared to be engaged in a road rage incident. *Declaration of Gabriela Bischof in Support of Motion to Suppress,* Ex. C, WA-7. At the intersection of Turk Street and Van Ness, the dark SUV stopped in the left lane of traffic and the white BMW pulled in behind it. *Id.* The dark SUV immediately reversed into the frontend of the BMW. *Id.* The sergeants heard the sound of a collision and then saw the driver of the BMW exit with a firearm in his hand. *Id.* They then heard the sound of one or two gunshots. *Id.* The dark SUV sped away down Turk, while the white BMW drove away northbound on Van Ness. *Id.* The sergeants lost sight of the

---

[1] The defendant's true surname is Cruz Velasquez, but to maintain consistency with the police reports, he will be referred to as Arteaga in this motion.

[2] Unless otherwise indicated, this statement of facts is based on records prepared/maintained by law enforcement. Defendant's recitation of the contents of those records is not an admission they are true.

white BMW at Ellis or Willow Streets. *Id.* Sergeant Kasper (5H5) sent out identifying information over dispatch, asking other units to look for a "WHI BMW, CN8VIW842 ... SUSP BMA" "POSS 4DR" with "FRONT END DAMAGE." Ex F, WA-90; WA-91. The sergeants returned to Turk and Van Ness to look for evidence, until they received word that a suspect, later determined to be Mr. Arteaga, had been taken into custody by other officers on the 700 block of Ellis Street. Ex. C, WA-7.

Officer O'Brien and Officer Sarcos responded to information broadcast by dispatch that a "white colored BMW with a displayed license plate of CN8VIW842" had been involved in a shooting, and the suspect was a "black male adult." Ex. A, WA-22. At approximately 6:44 p.m., as the officers were traveling westbound on Ellis from Larkin looking for the suspect and vehicle, Officer O'Brien noticed a 2-door white colored BMW parked in front of 710 Ellis Street. *Id.* He noticed that the vehicle's rear-displayed California license plate ended in -942, and was not able to see if the vehicle was occupied. Ex A, WA-22; Ex D, WA-336, 00:20-00:32. Officer O'Brien wrote: "[b]ecause the vehicle matched the previously broadcast vehicle description and the last three numbers I saw closely matched the previously broadcast license plate, I opted to return to the area to further investigate the vehicle I saw." Ex. A, WA-22. As they exited their vehicle, the officers observed a Hispanic male, later identified as Mr. Arteaga, standing on the sidewalk near the closed passenger door of the unoccupied BMW. Ex. B, WA-282.

As Officers O'Brien and Sarcos exited the police vehicle, Officer O'Brien commanded Mr. Arteaga to put his hands on his head. *See e.g.* Ex D, WA-336, approx. 00:35-1:30. Mr. Arteaga walked toward the street and put one hand up. *Id.* The officers walked toward Mr. Arteaga; Officer Sarcos on the street and Officer O'Brien on the sidewalk. *Id.* Officer O'Brien called for backup. *Id.* The two officers commanded Mr. Arteaga to get his hands out of his pockets and put them on his head. *Id.* at 00:45-00:46. Mr. Arteaga took his hand out of his pocket and raised his hands in the air. *Id.* at 00:48. He looked from one officer to the other and asked "What happening?" *Id.* at 00:50. The officers repeated their commands to put his hands on his head. *Id.* Mr. Arteaga then put his hands on his head and turned. *Id.*at 00:55. Mr. Arteaga then said: "What's happening? What did I do?" *Id.* At that point, Officer O'Brien yelled "You have to listen to me!," grabbed Mr. Arteaga's right arm, and "using an Academy arm bar take down" took him down until he was prone on the street. *Id.* at 00:55-

00:58; Ex. E, WA-331, 00:03-00:06; Ex. A., WA-22. Officer Sarcos then handcuffed and frisked Mr. Arteaga. Ex D. No weapon was found. *Id.* at 1:30.

During this minute, at least four more officers appeared on scene. *Id.* After the frisk, an officer pulled Mr. Arteaga's handcuffed wrists above his head and pulled him onto the sidewalk. *Id.* at 1:32-1:35. As Mr. Arteaga sits, an officer screams in his face: "Sit down! Stop moving! Keep your feet out!" *Id.* at 1:44. Officer O'Brien yells "You're being detained! You aren't listening to instructions, that's the problem!" *Id.* at 2:18-2:21. Five officers then searched under Mr. Arteaga's shirt and in his pocket. *Id.* at 3:02-3:22. Officer Sarcos tells Mr. Arteaga "If you have drugs we don't care" and another officer asks "Que tienes aqui?" while frisking Mr. Arteaga's jacket pocket. Ex. E, WA 331, 1:35; 2:05. Mr. Arteaga then made incriminating statements. Officers did not find a weapon during this search.

Approximately 20 minutes later, Mr. Arteaga advised officers that he had ingested fentanyl and an ambulance was called. Ex A, WA-22. As Officer Hargreaves lifted Mr. Arteaga onto a gurney, he felt a hard object he believed to be a firearm in Mr. Arteaga's pocket, opened his jacket, and recovered a firearm. Thereafter, Officer Montero conducted a canine search of the exterior and interior of the vehicle. *Id.* Officers Hargreaves and Smith then conducted a "probable cause search" of the vehicle, which yielded narcotics and a fired cartridge. Ex. A, WA-23.

## ARGUMENT

### I.   The Seizure and Searches Were Conducted Without a Warrant and Are Presumptively Illegal

#### A.   The Government Bears the Burden of Proving the Warrantless Seizure and Subsequent Search were Legal.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is well-established that warrantless seizures and searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Scott,* 705 F.3d 410, 416 (9th Cir. 2012). Mr. Arteaga was seized and the searches in this case were performed without the benefit of a warrant. The government bears the burden of proving a warrantless seizure or search was lawful, and it must do so by a

preponderance of the evidence. *United States v. Job*, 871 F.3d 852, 862-63 (9th Cir. 2017); *Scott*, 705 F.3d at 416; *United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987).

**B.    Mr. Arteaga Was Seized When Officer O'Brien and Officer Sarcos Forcibly Took Him to the Ground and Handcuffed Him**

An individual is seized within the meaning of the Fourth Amendment "when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts [his] liberty." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004)(internal quotation omitted). A person's liberty is restrained when, taking into consideration "all of the circumstances surrounding the encounter, the police conduct 'would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). Courts also have described the standard for a seizure as whether, in view of all the circumstances, "a reasonable person would have believed that he was not free to leave." *California v. Hodari D.,* 499 U.S. 621, 627 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007) (same).

While an analysis of whether a reasonable person would have felt seized considers the totality of the circumstances, the Ninth Circuit has identified five factors to aid in that determination: (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's tone or manner was authoritative, so as to imply that compliance would be compelled; and (5) whether the officers informed the person of his right to terminate the encounter. *Washington*, 387 F.3d at 1068. This list is non-exhaustive, however, and the presence of even one of these factors could amount to seizure. *See Washington,* 490 F.3d at 771 (discussing the several factors and noting that "any one of which, if present, could constitute a seizure"). Here, Officer O'Brien approached Mr. Arteaga with his hand on his weapon, used an "Academy arm bar take down", forced Mr. Arteaga to the ground while he was in compliance with officer commands to put his hands on his head, Officer Sarcos handcuffed him, and conducted (at minimum) a *Terry* frisk of him before another officer dragged him to the sidewalk still handcuffed, and at least four other officers searched him again. Clearly, Mr. Arteaga was seized for Fourth Amendment purposes by the time SFPD began the unlawful frisk, and the government cannot

1    reasonably contend otherwise.

2    ### C.    Mr. Arteaga Was Not Merely Seized But Was Actually Arrested When Officer
3    O'Brien and Officer Sarcos Forcibly Took Him to the Ground and Handcuffed
     Him

4         Moreover, the actions taken by law enforcement in this case indicate that Mr. Arteaga was

5    arrested at the point of the initial contact, rather than merely detained. A stop becomes an arrest if,

6    under the totality of circumstances, a reasonable person would conclude that he was not free to leave

7    after brief questioning. *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990); *United States v.*

8    *Pinion*, 800 F.2d 976, 978-79 (9th Cir. 1986). "The Ninth Circuit has established that, '[t]he proper

9    focus when determining the coerciveness or restraint sufficient to constitute an arrest is not the

10   subjective belief of the agents.'" *Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995) (quoting

11   *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988)) (alteration in original).

12   Rather, the court reviews the situation from the perspective of the person seized. *Id.* In certain

13   contexts, intrusive means of authority such as a show of force and the use of handcuffs is tantamount

14   to an arrest. *Id.* at 1296. "[H[andcuffing ... is not part of a typical *Terry* stop." *United States v.*

15   *Bautista*, 684 F.2d 1286, 1288–89 (9th Cir.1982), cert. denied, 459 U.S. 1211 (1983). Although the

16   length of detention is relevant in some cases, in others the police tactics may be sufficiently

17   aggressive and intrusive that even a brief stop is sufficient to constitute an arrest. *Id.* (holding that the

18   stop constituted an arrest because "[t]he show of force and detention techniques used in this context

19   are indistinguishable from police conduct in an arrest."). In determining whether an arrest occurred, a

20   court evaluates not only how intrusive the stop was, but also whether an officer had a sufficient basis

21   to fear for his or her safety to warrant a more intrusive action. *United States v. Rousseau*, 257 F.3d

22   925, 929 (9th Cir. 2001); *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). One factor in

23   this analysis is the number of police officers present; officers are more justified in using force where

24   they are alone or outnumbered. *Lambert*, 98 F.3d at 1190; *United States v. Jacobs*, 715 F.2d 1343,

25   1346 (9th Cir. 1983). In *Lambert*, the Ninth Circuit found that the ratio of four officers and one dog

26   to two suspects weighed against a finding that intrusive action was justified. 98 F.3d at 1190.

27   Initially, Officers O'Brien and Sarcos were the only officers on scene, yet they still outnumbered Mr.

28   Arteaga, and Officer O'Brien called for backup as he approached Mr. Arteaga. By the time he had

1    been taken to the ground, handcuffed, and frisked (a mere 15 seconds after the officers exited their

2    vehicle), at least four more officers had arrived on the scene.

3         The officers used some of the most aggressive methods available to them. While it is true that

4    they were searching for a suspect in a recent shooting, that fact alone cannot justify each of their

5    subsequent actions. In contrast to the officers' narration of events, the bodycam shows that Mr.

6    Arteaga complied with their commands, and that within 15 seconds of officers exiting their vehicle,

7    Mr. Arteaga had his hands on his head as ordered, and at that point the officers took him to the

8    ground. Officer O'Brien's interpretation that Mr. Arteaga's movements were a "precursor to flight"

9    was not objectively reasonable in light of Mr. Arteaga's demeanor and general compliance with the

10   officers' commands. Even if the officers' aggressive tactics were initially justified by the nature of

11   the crime suspected or Mr. Arteaga's confused behavior, that justification evaporated once they

12   frisked Mr. Arteaga, found no weapon, and backup officers arrived.

13        Courts should also "consider the specificity of the information that leads the officers to

14   suspect that the individuals they intend to question are the actual suspects being sought." *Lambert,* 98

15   F.3d at 1189–90. "The more specific the information [], the more reasonable the decision to take

16   extraordinary measures to ensure the officers' safety." *Id.* In *Lambert*, the Ninth Circuit considered

17   whether two men were arrested when police seized them at gunpoint, patted them down, and held

18   them in separate police cars. *Id.* at 1188-92. The men who were arrested matched the description of

19   suspected armed robbers insofar as they were two black men, one of which was reasonably short and

20   other of which was reasonably tall. *Id*. at 1190. The court held that such a general similarity in

21   physical characteristics between the arrested men and the suspected robbers was not sufficient to

22   warrant the intrusive means of arrest. *Id*. at 1190-92. Unlike *Lambert*, where there was at least some

23   description of the suspects (which was still held to be insufficient grounds to warrant the tactics

24   used), here there was not even the barest of descriptions of the person or persons possessing a

25   weapon. The suspect was vaguely described as a black male - without age, physical characteristics, or

26   clothing description- driving a white BMW. Here, Mr. Arteaga, a light skinned Hispanic male on the

27   sidewalk next to a white BMW, did not even match the insufficient description of the suspect. In

28   addition, although the license plate was called out through dispatch, Officer O'Brien could only see

1   three of the digits on the license plate and only two of those three digits matched the suspect vehicle.

2   The use of aggressive force to effectuate the stop of Mr. Arteaga was not warranted.

3         The likelihood that Mr. Arteaga was the suspect being sought was further reduced when

4   officers failed to locate a weapon after frisking him. "Even where certain facts might support

5   reasonable suspicion a suspect is armed and dangerous when viewed initially or in isolation, a frisk is

6   not justified when additional or subsequent facts dispel or negate the suspicion." *Thomas v. Dillard*,

7   818 F.3d 864, 877 (9th Cir. 2016).  In sum, SFPD officers seized an individual who did not match the

8   description of the suspect, violently put him in a body hold, took him to the ground, handcuffed him

9   and frisked him because they expected to find a firearm. They did not discover any firearm, and this

10  was readily apparent during the initial frisk. Even assuming for the sake of argument that the Court

11  finds that seizure and initial frisk were conducted with sufficient probable cause or reasonable

12  suspicion (a finding Mr. Arteaga disputes), the search of Mr. Arteaga should have stopped once the

13  officers frisked Mr. Arteaga and discovered no firearm or other contraband. Instead, they dragged

14  him to the sidewalk and performed a more invasive search. A reasonable person in Mr. Arteaga's

15  position would have felt he was under arrest and the seizure of Mr. Arteaga must be considered an

16  arrest.

17

18  **II.   The Government Cannot Carry Its Burden to Prove the Officers' Warrantless Seizure,**
        **Arrest, and Subsequent Searches Were Lawful and All Fruits of Those Fourth**
19      **Amendment Violations Must Be Suppressed**

20        The government bears the burden of proving that the warrantless seizure, arrest, frisk and

21  searches undertaken by the SFPD officers on November 9, 2021, fall within one or more exceptions

22  to the Fourth Amendment's warrant requirement. Because the government cannot justify the officers'

23  warrantless seizure and searches, all evidence – including Mr. Arteaga's statements, the weapon,

24  ammunition, casings, and narcotics -  obtained after these Fourth Amendment violations must be

25  suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

26        The government will likely argue that the officers' initial detention or arrest of Mr. Arteaga

27  was justified by reasonable suspicion or probable cause, and therefore all evidence obtained as a

28  result of that encounter need not be suppressed. A police officer may conduct a brief, investigatory

1  stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. *Illinois v.*

2  *Wardlow*, 528 U.S. 119, 123 (2000); *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The lawfulness of a stop

3  cannot depend on facts learned by officers after a stop, the stop must be "justified at its inception."

4  *Terry,* 392 U.S. at 20. "Reasonable suspicion" that a person is engaged in criminal activity "is formed

5  by specific, articulable facts which, together with objective and reasonable inferences, form the basis

6  for suspecting that *the particular person detained* is engaged in criminal activity." *United States v.*

7  *Colin*, 314 F.3d 439, 442 (9th Cir. 2002), emphasis added. Because the police did not have

8  reasonable, articulable suspicion to justify an investigatory *Terry* stop, it follows that they also did

9  not have probable cause to arrest Mr. Arteaga.

10      Probable cause exists when, at the time of arrest, the arresting officers know reasonably

11  trustworthy information sufficient to warrant a prudent person to believe that the accused had

12  committed or was committing a crime. *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979); *Allen*,

13  73 F.3d at 237. Here, officers lacked reasonable suspicion or probable cause because Mr. Arteaga's

14  mere presence near the suspect vehicle could not support reasonable suspicion; the description of the

15  suspect was too vague; in any event, Mr. Arteaga did not match the description of the suspect; and

16  finally, any initial suspicion had dissipated once officers learned that Mr. Arteaga did not match the

17  description of the suspect and a frisk revealed no weapons.

18

19      **A.   The Warrantless Arrest And/Or Seizure, Frisk, and Subsequent Searches**
          **Were Unconstitutional**

20

21          ***1.      Mere Presence Is Insufficient To Establish Probable Cause***

22      A person's mere presence or mere propinquity to criminal activity alone does not support

23  probable cause to search or arrest that person; the "mere presence doctrine" has logical application

24  where the facts and circumstances do not support an inference that the individual is connected to the

25  proximate criminal activity. *United States v. Buckner*, 179 F.3d 834 (9th Cir. 1999); *Ybarra v.*

26  *Illinois*, 444 U.S. 85 (1979). Moreover, ambiguous conduct of a person in proximity to a crime scene

27  does not establish probable cause. *Pinion*, 800 F.2d at 980.

28      In *Ybarra,* police learned that a bartender was selling heroin out of a tavern and obtained a

warrant to search the bartender and the tavern. 444 U.S. at 87–88. When the police arrived at the

1   tavern to execute the warrant, they announced upon entering that they would be conducting a

2   "cursory search for weapons" of each of the nine to thirteen customers in the tavern. One of the

3   officers frisked Ybarra, a patron in the tavern, and felt a cigarette pack in Ybarra's pocket during the

4   frisk; a few minutes later, he frisked Ybarra again, took the pack out of his pocket, and found six

5   packets of heroin inside. Both frisks were unconstitutional because the police lacked *individualized*

6   suspicion that Ybarra was engaged in criminal activity or was armed and dangerous. Here, police

7   suspected that the white BMW was involved in a crime, but Mr. Arteaga was merely present close by

8   it, rather than in a position – in the driver's seat, even collecting an item from the trunk - that

9   connected him to the proximate criminal activity. He was not aggressive when police approached

10  him, and when he was frisked, police found no weapon on his person. Certainly by the time officers

11  searched him on the sidewalk, officers had no information indicating that Mr. Arteaga himself was

12  involved in the shooting, and mere proximity to a crime scene cannot establish sufficient suspicion to

13  justify the officers' actions.

14
         ### 2.    *The Description of the Suspect Was Too Vague to Establish Probable*
15              *Cause or Reasonable Suspicion*

16       Mr. Arteaga's connection to the suspect vehicle was tenuous at best and as set forth above, his

17  mere proximity to the vehicle was insufficient to generate reasonable suspicion to detain him or

18  probable cause to arrest him. The description of the suspect was also too insubstantial to link Mr.

19  Arteaga to the criminal activity. Even had he matched the description of the suspected shooter, the

20  description was far too vague to generate reasonable suspicion, let alone probable cause.

21       Mere resemblance to a general description is insufficient to establish probable cause. *Grant v.*

22  *City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir.2002), amended by 334 F.3d 795 (9th Cir.2002)).

23  Nor is it sufficient to establish reasonable suspicion. "[A] description of race and gender alone will

24  rarely provide reasonable suspicion justifying police search or seizure." *Brown v. City of Oneonta*,

25  221 F.3d 329, 334 (2d Cir.2000); *see also United States v. Sigmond–Ballesteros*, 285 F.3d 1117,

26  1121 (9th Cir. 2001) ("[R]easonable suspicion may not be 'based on broad profiles which cast

27  suspicion on entire categories of people without any individualized suspicion of the particular person

28  to be stopped.' ").

Descriptions far more detailed than "adult black male" have been deemed insufficient to support probable cause or reasonable suspicion. In *United States v. Ricardo D.,* the fact that the defendant matched descriptions of the crime suspect as a "young, thin man, not too tall" and a "young, Mexican male" were insufficient to create probable cause. 912 F.2d 337, 342 (9th Cir.1990). Even "somewhat" matching a description more detailed than the one given here (listing sex, race, build, and color of clothing), is insufficient to establish reasonable suspicion. *See Dancy v. McGinley,* 843 F.3d 93, 109 (2d Cir. 2016) (finding no reasonable suspicion to stop individual who matched suspect description as "thin, black, and male" but who was wearing camouflage rather than brown jacket because description of suspect was too vague); *see also Goodson v. Corpus Christi,* 202 F.3d 730, 737 (5th Cir. 2000) (lookout broadcast for "tall, heavy-set, white man dressed as a cowboy" did not give police "reasonable suspicion to stop and frisk any tall, heavy-set, white man" because "[s]uch a description would simply be too vague, and fit too many people, to constitute particular, articulable facts on which to base reasonable suspicion"). The presence of many individuals in an area that match a description of a suspect means that an officer has less reasonable suspicion to search any one of them.  Here, officers searching the Tenderloin for a black male adult suspect would find no shortage of individuals to frisk, which is precisely why frisks based on such broad criteria are unconstitutional.

### 3.   *Where the Detained Person Does Not Match the Description of the Suspect, Seizure Violates the Constitution*

Mr. Arteaga did not match the description of the suspect: that critical factual discrepancy alone dispelled any reasonable suspicion that Mr. Arteaga was the shooter. *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988) (holding that there was no reasonable suspicion to justify a frisk when the officer discovered that the detained individual "did not match the description of either of the suspects"). In *Sialoi v. City of San Diego,* officers responded to a report that two armed black males wearing either a brown shirt or a hooded long-sleeved T-shirt had been seen in the parking lot of an apartment complex. 823 F.3d 1223, 1228; 1232–33 (9th Cir. 2016). When officers arrived at the scene of the crime, they encountered a large gathering of Samoan individuals celebrating a birthday.

1    *Id.* The officers detained multiple Samoan individuals even though they did not match the description

2    of the suspects, and were not "not ducking around the apartment complex suspiciously." *Id.* at 1235.

3    In spite of their proximity to a recent crime scene, the Ninth Circuit rejected justifications that the

4    detainees were out at night in an area known for criminal activity, and held that no reasonable

5    suspicion existed to detain or frisk them. *Id.*

6        Similarly, here, although Mr. Arteaga was found in the general area where a crime had

7    recently taken place, he was clearly not the "black male adult" Officer O'Brien was searching for.

8    Although it was dark out and the streetlights were on, it was mere seconds into the encounter that

9    Officer O'Brien was close enough to identify Mr. Arteaga's race. At that point, it should have

10   become obvious to him that he had no cause to detain Mr. Arteaga.

11               **4.**     ***Any Suspicion Dissipated As Soon As Police Viewed Mr. Arteaga Up***
12                    ***Close and Failed to Locate a Weapon After the Frisk***

13        While courts evaluate the totality of the circumstances when determining if a search was

14   supported by probable cause or reasonable suspicion, that analysis only takes into account

15   information already known to officers at the time of the challenged search or seizure. *United States v.*

16   *Grandberry*, 730 F.3d 968, n.6 (9th Cir. 2013); *Moreno v. Baca*, 431 F.3d 633, 639 (9th Cir. 2005).

17   As a corollary to the totality-of-the-circumstances rule, courts "may not disregard facts tending to

18   dissipate probable cause." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019)

19   (emphasis added); *see also United States v. Lopez,* 482 F.3d 1067, 1069 (9th Cir. 2007)*; United*

20   *States v. Ortiz- Hernandez*, 427 F.3d 567, 573-74 (9th Cir. 2005) (explaining probable cause "may be

21   dissipated if the investigating officer later learns additional information that decreases the likelihood

22   that the defendant has engaged, or is engaging, in criminal activity"). In other words, "totality" means

23   what it says: when assessing the legality of a search, courts cannot disregard known information that

24   tends to show probable cause or reasonable suspicion did not exist at the time of the search or seizure.

25   Here, any suspicion dissipated once officers were close enough to confirm that Mr. Arteaga was not a

26   black male, and further dissipated after the initial frisk when officers failed to locate a weapon.

27        In *Lopez,* the government contended that probable cause existed to arrest the defendant

28   because he generally matched the description of the suspect in an earlier shooting – a young, thin,

1   Hispanic man -  and he was seen driving a woman to the location of the suspect vehicle used in the

2   shooting. 482 F.3d at 1074. The woman then got into the suspect vehicle and drove it from the area,

3   with the defendant following close behind. *Id.* Nevertheless, the Ninth Circuit held that probable

4   cause to believe Lopez was the shooter had dissipated, in large part, when officers knew that he did

5   not match the more specific aspects of the suspect description (he was short rather than tall, was not

6   wearing a white sweater, and was not armed), nor did he match their newly obtained description of

7   the registered owner of the suspect vehicle. *Id.* at 1075. The Ninth Circuit also dismissed the

8   government's argument that "the critical factor giving rise to probable cause was … the connection

9   between the defendant and the suspect car" as more suggestive of mere presence than indicative of a

10  connection to the proximate criminal activity because Lopez was not directly or immediately

11  associated with the scene of the crime, his interaction with the vehicle took place some distance away

12  from the scene of the crime, and he did not make direct contact with the suspect vehicle himself. *Id.*

13          The officers in *Lopez* had far more reason to suspect Lopez of being the shooter than the

14  officers in this case had to suspect Mr. Arteaga. In *Lopez,* there was no question that the vehicle was

15  the same because, unlike here, the license plate was a match. *Id.* at 1070. Lopez's connection to the

16  car was also more clear cut because officers observed him assisting in its relocation. Even more

17  importantly, the defendant matched the majority of the suspect description, and once the mismatches

18  were known to the officers, their suspicion dissipated. Here, Mr. Arteaga had no connection to

19  vehicle other than proximity when police arrived and, based on his physical characteristics, was

20  *excluded* as the suspect. Even if the officers had reasonable suspicion or probable cause to effect an

21  aggressive stop of Mr. Arteaga when they saw him standing near the white BMW, that suspicion

22  dissipated once they were close enough to see that he was not a black male, and was further

23  dissipated by the failure to recover a weapon during the frisk. Accordingly, any further detention was

24  unlawful and all fruits of that unlawful seizure must be suppressed.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, Mr. Arteaga respectfully requests that this court grant his motion to suppress, or should material factual disputes arise, order an evidentiary hearing.

Dated:        August 25, 2022                              Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S
GABRIELA BISCHOF
Assistant Federal Public Defender