STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

LAUREN M. HARDING (CABN 308029)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-6938
     FAX: (415) 436-7234
     Lauren.Harding@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 3:22-CR-00101-WHO |
| Plaintiff, | OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS |
| v. | *Filed Concurrently with Declarations of Kyra Delaney, Jon Kasper, Daniel O'Brien, Sonya Sarcos, Victor Custodio, Michael Tursi, Louis Hargreaves, and Lauren Harding; Exhibits A-K Lodged with the Court* |
| WILMER ARTEAGA, | |
| Defendant. | |

i

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     FACTUAL BACKGROUND ..........................................................................................2

A.      Homicide Detectives Report a White BMW and a Black Male Involved in a Road
Rage and Shooting Incident in the Tenderloin. ...............................................................2

B.      Around Ten Minutes Later, Officers Identify a Dark-Skinned Man Immediately Next
to the White BMW Coupe. ..............................................................................................3

C.      The Suspect Disobeys Officers' Commands and Makes Incriminating Statements
Connecting Him to the BMW. ..........................................................................................4

D.      A Bystander Connects Arteaga to the BMW. .................................................................5

E.      The Homicide Detectives Who Witnessed the Shooting Identify the Car...................5

F.      Arteaga Gives False Names to Officers, Obstructing Their Ability to Identify Him. ...................5

G.      Arteaga Claims He Had Ingested Fentanyl and Is Provided Medical Care, and, as He
Is Transported to the Ambulance, Officers Find a Gun in His Jacket. ............................6

H.      The White BMW Is Searched and Found with a Second Fired Cartridge and Over
Two Pounds of Fentanyl. .................................................................................................7

III.    ARGUMENT .................................................................................................................7

A.      Officers Had Reasonable Suspicion to Stop Arteaga When They Saw Him
Immediately Next to the White BMW and He Defied Officers' Commands.....................8

        1.      Numerous articulable facts support there was reasonable suspicion to stop
                Arteaga. ..............................................................................................................9

        2.      Arteaga was more than "merely present" near a crime scene............................11

        3.      Arteaga's actual race did not obviate reasonable suspicion................................12

        4.      Not finding a gun on Arteaga's person right away did not dissipate the
                officers' suspicions. ..........................................................................................14

B.      The Initial Seizure of Arteaga Was an Investigatory Stop—Not a De Facto Arrest. ...................15

C.      The Preliminary Pat-Down Search of Arteaga Was Not a Violation of the Fourth
Amendment.....................................................................................................................18

D.      Shortly After the Initial Stop, If Not Sooner, Officers Developed Probable Cause to
Believe Arteaga Was the Road Rage Shooter..................................................................19

E.      The Officers' Subsequent Investigation That Uncovered the Ghost Gun on His Person
and Narcotics in the BMW Was Justified Under the Fourth Amendment. ...................21

        1.      The Officers' Investigation Into Arteaga's Identity Was Justified.......................21

2.     Officers' Actions in Finding the Gun and Other Items on Arteaga's Person
Were Proper. ................................................................................................22

3.     No Warrant Was Needed to Search the BMW Leading to the Discovery of
Over Two Pounds of Fentanyl .....................................................................22

F.    The Court Should Deny Defendant's Motion Without an Evidentiary Hearing ..........................23

IV.   CONCLUSION...................................................................................................................24

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Brown v. Texas*,
   443 U.S. 47 (1979)..................................................................................................... 21

5

6

*California v. Acevedo*,
   500 U.S. 565 (1991)................................................................................................... 23

7

8

*Dancy v. McGinley*,
   843 F.3d 93 (2d Cir. 2016).......................................................................................... 14

9

10

*Gillis v. City & Cnty. of San Francisco*,
   2011 WL 4404138 (N.D. Cal. Sept. 21, 2011) ............................................................. 9

11

*Goodson v. Corpus Christi*,
   202 F.3d 730 (5th Cir. 2000) ...................................................................................... 14

12

13

*Haynie v. Cnty. of Los Angeles*,
   339 F.3d 1071 (9th Cir. 2003) ..................................................................................... 16

14

15

*Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*,
   542 U.S. 177 (2004)................................................................................................... 21

16

17

*Illinois v. Caballes*,
   543 U.S. 405 (2005)................................................................................................... 23

18

*Illinois v. Gates*,
   462 U.S. 213 (1983)................................................................................................... 19

19

20

*Illinois v. Wardlow*,
   528 U.S. 119, (2000)............................................................................................. 8, 10

21

22

*Minnesota v. Dickerson*,
   508 U.S. 366 (1993)............................................................................................. 19, 22

23

24

*Powell v. Staycoff*,
   2019 WL 2524771 (D. Minn. June 19, 2019)............................................................. 13

25

*Rhode Island v. Innis*,
   446 U.S. 291 (1980)................................................................................................... 20

26

27

*Sialoi v. City of San Diego*,
   823 F.3d 1223 (9th Cir. 2016) ..................................................................................... 14

28

iv

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

*Terry v. Ohio*,
     392 U.S. 1 (1968) .................................................................................................. 8, 18

*United States v. Alvarez*,
     899 F.2d 833 (9th Cir. 1990) ...................................................................................... 17

*United States v. Arango*,
     912 F.2d 441 (10th Cir. 1990) ..................................................................................... 22

*United States v. Arvizu*,
     534 U.S. 266 (2002) ......................................................................................... 8, 10, 11

*United States v. Burkett*,
     612 F.3d 1103 (9th Cir. 2010) ................................................................................. 8, 18

*United States v. Edwards*,
     761 F.3d 977 (9th Cir. 2014) ................................................................................ 15, 16

*United States v. Franco*,
     787 F. App'x 381 (9th Cir. 2019) .................................................................................. 16

*United States v. Hartz*,
     458 F.3d 1011 (9th Cir. 2006) ....................................................................................... 9

*United States v. Howell*,
     231 F.3d 615 (9th Cir. 2000) ........................................................................................ 23

*United States v. Jacobs*,
     715 F.2d 1343 (9th Cir. 1983) ...................................................................................... 17

*United States v. Jensen*,
     425 F.3d 698 (9th Cir. 2005) ........................................................................................ 19

*United States v. Lopez*,
     482 F.3d 1067 (9th Cir. 2007) ................................................................................ 13, 14

*United States v. Mosley*,
     878 F.3d 246 (8th Cir. 2017) ........................................................................................ 13

*United States v. Ramirez*,
     473 F.3d 1026 (9th Cir. 2007) ...................................................................................... 21

*United States v. Ricardo D.*,
     912 F.2d 337 (9th Cir. 1990) ........................................................................................ 14

*United States v. Robinson*,
     414 U.S. 218 (1973) ..................................................................................................... 22

v

*United States v. Solorio-Mendoza,*
   731 F. App'x 583 (9th Cir. 2018) ........................................................................ 23

*United States v. Taylor,*
   715 F. App'x 740 (9th Cir. 2018) ........................................................................ 20

*United States v. Taylor,*
   716 F.2d 701 (9th Cir. 1983) ........................................................................ 16, 17

*United States v. Thomas,*
   863 F.2d 622 (9th Cir. 1988) ............................................................................ 12

*United States v. Torres,*
   828 F.3d 1113 (9th Cir. 2016) ........................................................................... 23

*Washington v. Lambert,*
   98 F.3d 1181 (9th Cir. 1996) ............................................................................ 17

*Ybarra v. Illinois,*
   444 U.S. 85 (1979) ..................................................................................... 11, 12

**Constitutional Provisions**

U.S. Const., amend. IV ................................................................................... *passim*

U.S. Const., amend. V .................................................................................... *passim*

**State Statutes**

Cal. Health & Safety Code § 11350(a) ..................................................................... 20

Cal. Penal Code § 148 .................................................................................... 18

Cal. Penal Code § 148.9 .................................................................................. 21

## I.   **INTRODUCTION**

On November 9, 2021, in rush-hour traffic at a busy intersection in the Tenderloin, Wilmer Arteaga shot twice at another car during an apparent road rage incident.  Two homicide detectives, who had serendipitously witnessed the incident at around 6:30 p.m., immediately reported the shooting to dispatch as involving a white BMW, likely with front-end damage, and a black male adult.  Officers in the area were put on high alert.

Around ten minutes later a few blocks away, officers identified a white BMW that closely matched the suspect car.  One officer said he saw someone inside the car.  The officers made a U-turn, at which point officers saw Arteaga, a dark-skinned Hispanic man wearing all black, standing immediately next to the BMW, whose internal lights had turned on and off.  He was alone next to the car.  Officers suspected him to be the road rage shooter.

As officers approached Arteaga, who officers thought was armed and dangerous, Arteaga disobeyed commands and turned away, signaling he might run.  Officers forcefully detained Arteaga and placed him in handcuffs.  Their tactics were calibrated to detaining a suspected shooter who signaled he may run, so Arteaga was not arrested.  Officers even told him he was being "detained."  At the point of his detention, officers had reasonable suspicion, based on myriad facts and under a totality of the circumstances, to detain Arteaga.

The developing facts—far from dissipating their suspicions—ripened officers' suspicions into probable cause.  Two to three minutes into the stop, Arteaga stated—unprompted—that he had "dope," his car had been hit, and he had tried to look for the car that hit his car.  In other words, Arteaga connected himself to the white BMW that had visible front-end damage and also implicated himself in yet another crime (possessing narcotics).  Shortly after the defendant's statements, the homicide detectives confirmed the BMW was the same one involved in the road rage incident they had seen.  If not sooner, at this point, there was probable cause to believe that Arteaga was the road rage shooter.

Although there was probable cause to do so, the officers did not formally arrest Arteaga at this point, but continued to investigate.  Their investigation was impeded by Arteaga, who gave officers three different fake names, and delayed by his claim to having ingested fentanyl, which prompted the

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

officers to call a medic and ambulance.  As an officer lifted him onto a gurney to be transported to the

hospital, an officer felt and then found a gun in his jacket.  This discovery solidified the officers'

probable cause to arrest Arteaga as the road rage shooter.

The remainder of the officers' investigation is only vaguely challenged by the defendant's

motion—likely because the remainder of the encounter is unassailable.  As they continued to investigate,

officers found the BMW keys next to Arteaga's gurney (which had likely fallen from his pockets);

summoned a K-9 who sniff-searched the BMW and alerted to drugs; and searched the BMW, where

they found over two pounds of fentanyl, among other drugs, and a shell casing.  Officers also found car

debris and a second shell casing at the site of the shooting.

Each step of the officers' investigation was supported by either reasonable suspicion or probable

cause to uncover the gun, drugs, and other evidence of Arteaga's crimes.  Because no Fourth

Amendment violation occurred, the defendant's motion should be dismissed.[1]

## II.     FACTUAL BACKGROUND

### A.      Homicide Detectives Report a White BMW and a Black Male Involved in a Road Rage and Shooting Incident in the Tenderloin.

On November 9, 2021, at around 6:30 p.m., SFPD homicide inspectors Sgt. Jon Kasper and Sgt.

Kyra Delaney were driving on Turk Street when they saw two cars engaging in apparent road rage.

Delaney Decl. ¶¶ 3-4; Kasper Decl. ¶ 3.  One car was a white, two-door BMW and the other a dark-

colored SUV.  *Id.*

At around 6:32 p.m., at the intersection of Van Ness Avenue and Turk Street, the SUV stopped

in the left lane and backed into the front-end of the BMW.  Delaney Decl. ¶ 4; Kasper Decl. ¶ 5.  The

driver the BMW exited the car holding a pistol and fired two shots toward the SUV, which was speeding

off.  Delaney Decl. ¶¶ 5-6; Kasper Decl. ¶¶ 6-7.  They later found one shell casing and car debris at the

scene.  Delaney Decl. ¶ 7.  Officers later found a car in the line of fire with a bullet hole in it.

---

[1] This opposition is accompanied by Exhibits A through K, lodged with the Court at ECF No. 37, and the declarations of San Francisco Police Department ("SFPD") Sgt. Kyra Delaney, Sgt. Jon Kasper, Officer Daniel O'Brien, Officer Sonya Sarcos, Officer Victor Custodio, Sgt. Michael Tursi, Officer Louis Hargreaves, and Assistant U.S. Attorney Lauren Harding.

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

The inspectors followed the white BMW for a few blocks and saw it turn right (eastbound) from Van Ness onto Ellis Street.  Delaney Decl. ¶ 6.  As they were following the car, Sgt. Kasper reported to dispatch that he had seen shots fired.  Kasper Decl. ¶ 9, Ex. A (certified CAD); Ex. B (recorded call to dispatch).  He described the suspect car as a white, two-door BMW with license plate 8VIW842, which was the "best he could get" and might be off.  *Id.* ¶¶ 9-13, Ex. B.  He stated the driver was a black male adult, which was his best assessment of the driver's appearance given the dark lighting and his vantage point.  *Id.* ¶ 11.  He reported the BMW's last seen location was Ellis Street and the BMW likely had front-end damage to it.  *Id.* ¶¶ 9, 12.

### B. Around Ten Minutes Later, Officers Identify a Dark-Skinned Man Immediately Next to the White BMW Coupe.

At around 6:33 p.m., dispatch reported to the field "Code 33" involving "shots fired" out of Eddy and Van Ness.  Harding Decl., Ex. C.  Dispatch reported the shooting at 6:35 involving a white BMW (8VIY842), possibly a four-door, with a "BM" (i.e., black male) suspect.  *See id.*, Ex. D.  The suspect car had front-end damage.  *Id.*  The reports were from both a "5H5" (i.e., the homicide inspectors) and a "909" (i.e., a civilian).  *Id.*

The "Code 33" put officers in the area on high alert for the shooting suspect, suspect car, and possible victims.  O'Brien Decl. ¶ 3.  Officers O'Brien and Sarcos were among the officers responding to the alert.  At around 6:43 p.m.—less than ten minutes after first hearing dispatch's description of the suspect car—Officer O'Brien saw a white BMW coupe parked on Ellis Street.  O'Brien Decl. ¶¶ 5-6; Sarcos Decl. ¶ 6.  The last three digits of the BMW's license plate (942) closely matched the last three digits from Sgt. Kasper's report (842).  *Id.*  Both officers thought it looked like the suspect car.  *Id.*

According to Officer Sarcos, when they first saw the car, Officer O'Brien said he saw someone inside the car.  Sarcos Decl. ¶ 5.  The officers then made a U-turn, turned on their flashing lights, and parked behind the BMW, at which point Officer O'Brien saw a man standing within an arm's length of the passenger door of the BMW.  O'Brien Decl. ¶ 7.  He also saw the car's internal light go on and off, suggesting to Officer O'Brien that the man had recently exited it.  *Id.*  The man was the only person in the immediate vicinity of the car.  *Id.*  Officer Sarcos describes the suspect she encountered as a dark-skinned male—potentially black or Hispanic.  Sarcos Decl. ¶ 8.

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

Surveillance footage from a nearby storefront corroborates these accounts and shows Arteaga was in the driver's seat of the BMW as the officers first passed him.  Harding Decl., Ex. E (min. 3:19 to 3:30).  After the officers turned on their flashing lights and turned around, Arteaga got out of the BMW and was touching the passenger side door of the car—which had its internal lights on—when officers first approached him.  *Id.* (4:06).

### C.     The Suspect Disobeys Officers' Commands and Makes Incriminating Statements Connecting Him to the BMW.

Officer O'Brien approached the suspect and commanded the man to stop walking and to place his hands on his head.   O'Brien Decl. ¶¶ 8-9 and Ex. F (min. 0:38).  The suspect disregarded those commands, at which point Officer O'Brien called for back-up.  *Id.*  Officer O'Brien repeated his commands for the suspect to put his hands on his head multiple times, at which point the suspect briefly put his hands on his head and then removed them again.  *Id.*  The suspect then started backing up into the traffic lane and turned his back towards the officers, suggesting potential flight to Officer O'Brien. O'Brien Decl. ¶ 9.  Fearing flight and dealing with a potential shooting suspect, the officers used physical force to detain the suspect.  *Id.*  The suspect resisted and Officer Sarcos noticed him reach for his pocket, potentially reaching for a weapon, and she warned the other officers to "watch his pockets because he wouldn't take his hands out of his pockets."  Sarcos Decl. ¶ 9 and Ex. G (min. 0:45).

For officer safety reasons, Officer O'Brien placed the suspect in handcuffs.  O'Brien Decl. ¶ 10. Other officers took Arteaga before Officer O'Brien conducted a pat-down search.  *Id.*  Arteaga resisted officers' attempts to bring him to the sidewalk and was kicking out his legs to try to obstruct their efforts to detain him.  Custodio Decl. ¶ 3.  In response, one officer told Arteaga to "sit down, stop moving, get your feet out."  Sarcos Decl., Ex. G (min. 0:50).  Officer O'Brien then told the suspect he was "being detained" and needed to listen to instructions.  O'Brien Decl. ¶ 10, Ex. F (min. 2:00).

Other officers, who had arrived on scene, conducted a pat-down search of Arteaga for weapons around 6:46 p.m.  *See* Custudio Decl. ¶ 4; Sarcos Decl., Ex. G (min. 1:00 to 2:20).  Arteaga squirmed in resistance as officers frisked him.  *Id.*  Officers did not find a weapon (which, as we now know, he possessed).  As officers frisked him, the suspect stated "I got dope."  Custodio Decl., Ex. H (min. 2:15).

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

At around 6:47 p.m.—nearly immediately after the officers ended their frisk—Arteaga volunteered, unprompted, that someone "hit my car," that he had "tried to follow him looking," and "some people hit my car." Custodio Decl. ¶ 6 and Ex. H (min. 2:55). He made these statements on the sidewalk next to the white BMW that had visible front-end damage to it. *Id.*; *see also* Sarcos Decl. ¶ 13.

### D. A Bystander Connects Arteaga to the BMW.

At around 6:49 p.m., a man standing nearby told Officer Custodio something to the effect of "check under the tires," directing at the BMW. Custodio Decl. ¶ 7, Ex. H (min. 5:00). The man confirmed he meant the front right tire. *Id.* Officer Custodio interpreted the man's statement as saying that he had witnessed Arteaga place something under the front tire of the BMW. Custodio Decl. ¶ 7.

### E. The Homicide Detectives Who Witnessed the Shooting Identify the Car.

By 6:52 p.m., the homicide inspectors who had witnessed the shooting were on scene. O'Brien Decl., Ex. F (min. 9:30 showing the inspectors had arrived). They both identified the car as the same one involved in the shooting incident. Delaney Decl. ¶ 8; Kasper Decl. ¶ 14. They confirmed the car before 6:57 p.m., when Officer O'Brien was told that Sgt. Delaney had confirmed the car was the suspect car. O'Brien Decl. ¶ 15.

The detectives also thought Arteaga looked similar to the suspect. According to Sgt. Delaney, Arteaga's clothing was similar. Delaney Decl. ¶ 9. According to Sgt. Kasper, Arteaga looked similar in stature, height, and skin tone. Kasper Decl. ¶ 15.

### F. Arteaga Gives False Names to Officers, Obstructing Their Ability to Identify Him.

Officers then sought to identify Arteaga, who was a shooting suspect, for officer safety reasons. Identifying a suspect can help officers assess a suspect's threat level by identifying whether the suspect owns a firearm or was involved in earlier shootings. O'Brien Decl. ¶ 12. But Arteaga provided a series of fake names that obstructed, and delayed, officers' attempts to identify him.[2]

---

[2] Arteaga is known by law enforcement as "Wilmer Arteaga." Defendant admits his true surname is "Cruz Velasquez," *see* Opp. at 1, but omits admitting to his true first name, which is "Silvio Bertilio." *See* 4:19-cr-01543-RCC-LAB (D. Ariz. Sept. 18, 2019) (Judgment in separate case). Arteaga did not tell law enforcement his name was "Silvio" at the scene on November 9, 2021.

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

At around 6:47 p.m., the defendant stated that his name was "Anthony Velasquez" with a date of birth "10/17/92." O'Brien Decl. ¶ 13, Ex. F (min. 4:15). Officer O'Brien also searched the license plate and VIN of the car and it returned to someone other than "Anthony Velasquez." O'Brien Decl. ¶ 13.

At around 6:54 p.m., the defendant stated his name was "Joseph" and "my bad" for not saying the correct name initially. *Id.* ¶ 14, Ex. F (min. 11:00).

At around 6:57 p.m., he told officers his date of birth was October 17, 1991—rather than "1992," as he had previously told officers. *See* Harding Decl., Ex. I (min. 10:30).

At around 7:00 p.m., the defendant said his name was "Anthony Cruz Velasquez." O'Brien Decl. ¶ 16, Ex. F (min. 17:25).

Each time the defendant provided a different name, Officer O'Brien searched for the name and assessed whether the results matched the person detained. O'Brien Decl., Ex. F (mins. 4:15 to 21:00).

At around 7:01 p.m., officers identified the defendant as "Wilmer Arteaga" by searching for a name on the suspect's neck tattoo (Maya) into a mobile phone application that allows law enforcement to search mug shots of previously arrested persons in San Francisco. *See* Harding Decl., Ex. I (min. 13:40 to 15:45).

### G. Arteaga Claims He Had Ingested Fentanyl and Is Provided Medical Care, and, as He Is Transported to the Ambulance, Officers Find a Gun in His Jacket.

At 7:03 p.m., Arteaga claimed to have swallowed fentanyl. Harding Decl., Ex. I (min. 15:45). An ambulance arrived at around 7:07 p.m. and a medic attended to the defendant around a minute later. *Id.* (min. 21:20).

At around 7:15 p.m., officers performed a gun-shot residue test on Arteaga. Hargreaves Decl., Ex. J (min. 29:00). At around 7:17 p.m., as the defendant was being loaded onto the gurney to get into the ambulance, Officer Louis Hargreaves felt a heavy, hard object inside Arteaga's person that he immediate recognized as a gun. Hargreaves Decl. ¶ 3. He reached inside the jacket and found a pistol, later identified as a ghost gun. Hargreaves Decl. ¶ 3, Ex. J (min. 30:00).

Officers then searched Arteaga's person incident to arrest and found, among other things, evidence consistent with drug dealing, including $3428 in cash, marijuana, and a three small bags of a white powdery substance.

6

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

**H.     The White BMW Is Searched and Found with a Second Fired Cartridge and Over Two Pounds of Fentanyl.**

As the body-worn camera footage shows, throughout the investigation, officers had looked—without success—for the keys to the BMW.  Sgt. Michael Tursi finally found the keys to the BMW next to the gurney where Arteaga had been searched.  Tursi Decl. ¶ 4, Ex. K.   Finding the keys next to the gurney strong suggested they had fallen from the defendant's pockets, although Officer Tursi did not see the keys fall.  *Id.*

Narcotic detection K-9 Cooper sniff-search the outside of the car and alerted to the presence of drugs.  A subsequent search of the BMW found nearly 2 pounds of fentanyl in 55 different bags, along with cocaine, methamphetamine, heroin, and marijuana.  Officers also found one fired cartridge casing that matched the gun found in Arteaga's jacket.

*     *     *

After Arteaga was medically cleared at the hospital, he was arrested and booked on various state offenses, including firing a firearm at an occupied car, resisting arrest, and narcotics offenses.

### III.     ARGUMENT

Officers had reasonable suspicions to stop Arteaga as the possible road rage shooter when they first encountered him on Ellis Street, only few blocks away from the shooting and only about ten minutes later.  Officers thought Arteaga had recently exited the BMW, which closely matched dispatch's description of the suspect car, and he evaded their commands.  The defendant's narrow focus on particular facts, such as the defendant's race, disregards numerous additional facts supporting reasonable suspicion under "totality of the circumstances."  And the defendant's argument that he was "merely present" near the suspect car contorts the facts; surveillance footage, lodged with the Court as Exhibit E, plainly corroborates officers' accounts that they thought Arteaga had recently exited the car and was standing alone immediately next to the car.

Officers did not, as the defendant contends, arrest Arteaga when they first stopped him.  To be sure, the officers used physical force and handcuffs to detain Arteaga, who had disobeyed officer commands and signaled he may flee.  But whether a seizure is a stop or arrest under the Fourth Amendment does not, as defense would have it, look only to a defendant's perspective.  The analysis

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

also considers the officer's perspective.  The officers here reasonably thought they were detaining someone who was armed and dangerous (and even so reckless as to fire shots in the middle of a busy intersection during the commuting hour).  Because the manner of the detention was calibrated to the circumstances, it was not a de facto arrest under the Fourth Amendment requiring probable cause.

If not sooner, officers had probable cause to arrest Arteaga at the point he made unprompted statements connecting himself to the suspect car and the homicide detectives confirmed the white BMW was the same car involved in the shooting they had seen.  Far from dissipating their suspicions, officers' further investigation, during which Arteaga gave several different and fake names, validated their initial suspicions that Arteaga was the shooter.

Although not directly challenged by the defendant, the remainder of the encounter was consistent with the Fourth Amendment:  The officers felt and found the firearm in Arteaga's jacket by "plain feel," they properly searched his person incident to arrest, and they had probable cause to search the BMW, where they found the huge quantities of fentanyl.

No Fourth Amendment violation happened and the defendant has presented no reason to think otherwise.[3]  His motion should be denied.

## A.   Officers Had Reasonable Suspicion to Stop Arteaga When They Saw Him Immediately Next to the White BMW and He Defied Officers' Commands.

Police can stop a suspect for investigation if they have reasonable, articulable suspicion that criminal activity is afoot.  *See Terry v. Ohio*, 392 U.S. 1, 30 (1968).  "While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123, (2000).  The totality of the circumstances—not just one particular fact—governs. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  The reasonable suspicion determination is also "made with reference to the collective knowledge of the officers involved, and the inferences reached by experienced, trained officers. *United*

---

[3] The parties' briefing schedule includes a government sur-reply.  The government will respond to any new or different challenges to the encounter on sur-reply.

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

*States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (citations and internal markings omitted).  The officers here undoubtedly had reasonable suspicion for Arteaga's initial stop.

>    1.    *Numerous articulable facts support there was reasonable suspicion to stop Arteaga.*

A myriad of articulable facts, taken together, made officers reasonably suspect they had found the road rage shooter when they first stopped him on Ellis Street next to the white BMW.  The facts supporting reasonable suspicion included:

- The car—including its make (BMW) and color (white)—closely matched dispatch's description of the suspect car broadcast involved in the shooting;

- The BMW had very similar license plate, whose last three digits (942) closely matched those reported over dispatch (842);

- The BMW was parked at 710 Ellis Street, a mere three blocks away from where the shooting happened at Van Ness Avenue and Turk Street;

- The officers approached Arteaga less than ten minutes after the reported shooting;

- According to Officer Sarcos, Officer O'Brien said he saw someone inside the BMW when they first saw it; when the officers turned around, Arteaga was standing within an arm's reach of the BMW and the BMW's lights had turned on and off, suggesting to Officer O'Brien Arteaga had recently exited the car;

- Arteaga fit the general description of the shooter; Officer Sarcos perceived Arteaga to be a dark-skinned man—either black *or* Hispanic—which she thought was generally consistent with the report of a "black adult man;"

- When approached, Arteaga did not obey the officers' multiple commands to put his hands on his head and instead entered the traffic lane and turned his back on officers, suggesting to Officer O'Brien he might flee;

- Arteaga was stopped in a high-crime neighborhood of the Tenderloin, known for and shootings.

Taken together, those facts justify the officers' decision to stop Arteaga to investigate whether he was, in fact, the road rage shooter.  Similar facts in other cases have provided reasonable suspicion to stop a suspect, including a close match (although not perfect) to the description of the suspect car, *see United States v. Hartz*, 458 F.3d 1011 (9th Cir. 2006) (reasonable suspicion to stop a truck even though

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

the license plate number did not match because other facts justified the officers' suspicions that it was the suspect car); the presence a few blocks from the crime scene only a short time later, *see Gillis v. City & Cnty. of San Francisco*, 2011 WL 4404138, at *3 (N.D. Cal. Sept. 21, 2011), *aff'd*, 560 F. App'x 665 (9th Cir. 2014) (reasonable suspicion when, among other things, a mugging had been reported "a short time earlier, two blocks south"); evasiveness from police with the potential risk of flight, *see Wardlaw*, 528 U.S. at 124 (evasiveness and flight from police relevant in determining reasonable suspicion)[4]; and the presence in a high-crime neighborhood, *see Wardlaw*, 528 U.S. at 124 (location of stop in a high crime neighborhood is a relevant consideration in *Terry* analysis).  But, of course, the totality of the circumstances governs and no single factor should be viewed in isolation.

In his motion, the defendant either disregards facts altogether or attempts to separate and dissect each of the facts individually.  *See, e.g.*, Opp. at 8 (arguing mere presence to a crime scene is insufficient) and 9 (arguing that the description of the suspect was too).  The Supreme Court has emphasized that a narrow focus on any given fact distorts the proper legal standard; the facts must instead be analyzed collectively.  *See generally Arvizu*, 534 U.S. at 274 (holding that that Ninth Circuit's "divide-and-conquer" approach that evaluated and rejected each of seven different factors improperly disregarded the proper "totality of the circumstances" standard).  The totality of the circumstances standard, which "allows officers to draw on their own experience an specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person,'" *Arvizu*, 534 U.S. at 273, lead the officers here to detain and eventually arrest the right person.

---

[4] The defendant argues that Officer O'Brien's conclusion that Arteaga's movements were a "precursor to flight" was not reasonable given Arteaga's "demeanor and general compliance with officer commands." Opp. at 6.  This misconstrues the facts, which the Court can confirm by reviewing Officer Sarcos's or Officer O'Brien's body-worn camera footage that show Arteaga (a) disobeyed multiple commands to put his hands on his head, (b) was evasive, and (c) reached for his pocket.  *See* Exs. F, G.

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

2.       *Arteaga was more than "merely present" near a crime scene.*

Officers did not stop Arteaga, as he suggests, because of his "mere presence" "near" or "close by" the suspect vehicle.  *See* Opp. at 8, 9.  Instead, the officers reasonably suspected Arteaga had recently exited the car.  Officer Sarcos recalls hearing Officer O'Brien say someone was in the car when they first passed it (Sarcos Decl. ¶ 5); Officer O'Brien recalls the car's internal lights go on and off, suggesting Arteaga's recent exit (O'Brien Decl. ¶ 7); and Officer O'Brien remembers approaching Arteaga as he stood within an arm's length next to the BMW (O'Brien Decl. ¶ 7).  Surveillance footage corroborates their narratives and shows Arteaga inside the car when the officers first pass it.  *See* Harding Decl., Ex. E (min. 3:19 to 3:30).  When officers first approached on foot, Arteaga is seen immediately next to the car, whose internal lights were on, and even touching it.  *Id*. (min. 4:06) (*see image below*).  Arteaga's connection to the car was thus neither "ambiguous" nor "tenuous," Opp. at 9.



The BMW itself very closely matched the reported description of the subject car (including its BMW make, white color, and similar license plate), and involved in an active shooting only a few blocks away, around ten minutes earlier.  Officers also reasonably believed Arteaga matched the suspect's general description of a "black male."  The officers thus had ample facts beyond Arteaga's "mere presence" to suspect him as the road rage shooter.

*Ybarra v. Illinois*, 444 U.S. 85 (1979), relied on by the defendant, Opp. at 8-9, is distinct for almost too many reasons to count.  In *Ybarra*, there were *nine to thirteen* customers whom police

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

stopped and frisked inside a tavern, 444 U.S. at 88, whereas the defendant here was found alone next to the BMW.  *See* Harding Decl., Ex. E (min. 4:06) (showing the defendant alone next to the BMW when first approached).  Unlike the potentially innocent tavern patrons who may have been present purely for a pint in *Ybarra*, Arteaga was not "merely present" by the BMW; facts instead supported a reasonable belief that he had recently exited the car.  A tavern, which is open to all with a valid ID, is also distinct from a car, which is private and requires personal keys to access.  So Arteaga's suspected exit from a car was more meaningful than presence in a public bar.  Finally, the defendant in *Ybarra* did not make any "gestures or other actions indicative of an intent to commit an assault," 444 U.S. at 93, whereas Arteaga here reached for his pocket, potentially signaling he was reaching for a weapon.

> 3.    *Arteaga's actual race did not obviate reasonable suspicion.*



Defendant makes much of the discrepancy between Sgt. Kasper's reported race of the shooting suspect (black) and his actual race (Hispanic).  *See* Opp. at 6.  But this discrepancy did not obviate officers' reasonable suspicions that Arteaga matched the suspect's general description.  As Officers Sarcos explains, she first perceived him as either black or dark-skinned Hispanic.  Sarcos Decl. ¶ 8.  This perception was reasonable given the dark lighting, Arteaga's all-black clothing, and Arteaga's perceived dark complexion.  It was also corroborated by images of the defendant at the time of the stop.  *See* O'Brien Decl., Ex. F (min. 0:45) (*see image above*).  So the officers' reasonable suspicion that they were stopping the right suspect did not dissipate upon closer view of Arteaga.  *Contra United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988) (cited at Opp. at 10) (closer inspection of detainee made clear he did not match description of suspect, who were reported to be wearing a plaid suit or tan jacket).

More fundamentally, officers did not detain Arteaga merely because he matched the general description of the suspect shooter.  *See* Opp. at 9 (arguing the suspect description was too insubstantial) and 10 (arguing the obvious point that a search of every and any "black male adult" in the Tenderloin would be unconstitutional).  Instead, officers detained someone who they thought was closely connected

to a suspect car involved in a nearby shooting.  And they did so around ten minutes after dispatch's report of "shots fired" and only few blocks away.   Under those circumstances, it was reasonable to stop *anyone* who officers reasonably suspected had recently occupied the suspect car, regardless of that person's race or gender.  *See, e.g.*, *United States v. Mosley*, 878 F.3d 246 (8th Cir. 2017) (close temporal and physical proximity of a car that closely matched a suspect car provided sufficient reasonable suspicion even when the driver of the car did not match the suspect descriptions).

Even assuming the officers should have noticed Arteaga's race did not match the description of the suspect's race (which is not a reasonable assumption), race alone should not have governed the officers' actions.  The defendant suggests it should have by arguing that seeing Arteaga's actual race (Hispanic) up close "dispelled any reasonable suspicion that Mr. Arteaga was the shooter."  Opp. at 10. Focusing on Arteaga's skin tone alone would have been unreasonable and imprudent.  In Officer Sarcos's experience, it is difficult to distinguish race among individuals with similar complexions at night.  Sarcos Decl. ¶ 8; *see, e.g.*, *Powell v. Staycoff*, 2019 WL 2524771, at *11 (D. Minn. June 19, 2019) ("[T]he officers were not in a position to judge possible gradients of skin color so as to entirely dispel their reasonable suspicion about Powell. . . . Just as it can be reasonable to mistake a woman for a man under certain circumstances, it is not inconceivable that someone could mix up a black man and a Hispanic man.").  More fundamentally, focusing on his skin tone alone improperly disregards numerous other facts implicating Arteaga, which are properly considered under the "totality of the circumstances" standard.  Race, standing alone, should not, and did not, govern.

The defendant's reliance on *United States v. Lopez*, 482 F.3d 1067, 1069 (9th Cir. 2007) does not counsel otherwise.  In that case "substantial, countering indicators" dissipated probable cause.  That did not happen here.  In *Lopez*, the defendant was "not directly or immediately associated with the scene of the crime," 482 F.3d at 1075, whereas, here, the defendant was found *immediately next to* the BMW and suspected of recently exiting it.  The defendant in *Lopez* was also found "some distance away from the crime scene," and eight hours later, *id.* at 1075 and 1070, whereas Arteaga was found merely a few blocks away from the last seen location of the BMW and only ten minutes later.  Further, officers found Lopez to be "very cooperative," *id.* at 1075, whereas Arteaga disobeyed multiple officer commands.

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

Finally, and as explained more later, as the stop of defendant progressed, the officers here only gained *more* suspicions to believe they had located the correct shooter. The *Lopez* court even acknowledged that, as here, "it is permissible to consider a general physical description where it is found *in combination with* other particularized bases for suspicion." *Id.* at 1074 (emphasis added).

For similar reasons, the defendant's citations to cases involving generalized description of suspect(s), without much (if anything) more, are inapposite. *See Sialoi v. City of San Diego*, 823 F.3d 1223 (9th Cir. 2016) (cited at Opp. at 10) (§ 1983 case where 911 report of "two armed black males" not enough to arrest multiple individuals found celebrating a seven-year old birthday and without any other facts connecting the arrestees to the reported crime); *United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir. 1990) (cited at Opp. at 10) (probable cause based "only" on a generalized description of a suspect insufficient to detain someone); *Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) (cited at Opp. at 10) (presence near someone else who vaguely met description of robbery suspect, with little else more, insufficient); *Goodson v. Corpus Christi*, 202 F.3d 730, 737 (5th Cir. 2000) (cited at Opp. at 10) (grant of summary judgment improper when whether detainee met description of suspect was in dispute and was "critical" to qualified immunity analysis).

        4.    *Not finding a gun on Arteaga's person right away did not dissipate the officers' suspicions.*

Defendant argues that any suspicions that Arteaga was the road rage shooter "further reduced when officers failed to locate a weapon after frisking him" and, as such, the stop should have stopped at that point. Opp. at 7; *see also* Opp. at 6 (arguing that the officers' tactics "evaporated once they frisked Mr. Arteaga, found no weapon, and backup officers arrived"). Not so. To start, Officers O'Brien and Sarcos did not conduct a pat-down search of Arteaga for weapons when they first detained him. O'Brien Decl. ¶ 10. Instead, after placing Arteaga in handcuffs, the officers immediately turned Arteaga over to other officers, who conducted a pat-down search. *Id.* Ex. F (min. 1:33). So officers had no knowledge as to whether he possessed a weapon when he was first placed on the sidewalk.

Even assuming that Arteaga was briefly frisked on the street, it belies logic to say that a failure to find a weapon on his person dissipated the officers' suspicions. After all, his person was not the only place to hide a weapon. Arteaga could have stashed the gun several places—including in his car nearby.

14

**B.      The Initial Seizure of Arteaga Was an Investigatory Stop—Not a De Facto Arrest.**

The government does not dispute that Arteaga was "seized" for Fourth Amendment purposes after being handcuffed.  *See* Opp. at 4.  His initial seizure was not an arrest, as defendant contends, but instead an investigatory stop.  Officer O'Brien even told him that he was "being detained" (not arrested). O'Brien Decl. ¶ 10, Ex. F (min. 2:00).  Although officers used forceful means to detain the defendant— including a physical take-down and handcuffs—forceful means alone do not transform a seizure into an "arrest," where, as here, those means are necessary for officer safety and to prevent a defendant's flight.

"The totality of the circumstances determines whether and when an investigatory stop becomes an arrest."  *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014).  This analysis has two components.  *Id.*  "First is the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted." *Id.* (internal markings omitted).  This inquiry is viewed from the detainee's perspective.  Second is "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken."  *Id.* This inquiry is from law enforcement's perspective. *Id.* "The second inquiry frequently proves determinative." *Id.* (citation omitted).  Because the government does not dispute that Arteaga did not feel free to leave when he was first detained and handcuffed, the second inquiry governs.

When officers first detained Arteaga, whom they thought was the road rage shooter, they reasonably suspected that he was armed and dangerous given the report that he had fired shots around ten minutes before and a few blocks away.  *See* O'Brien Decl. ¶ 7 (suspecting Arteaga to be armed and dangerous when he first approached).  Officers O'Brien and Sarcos saw the BMW after hearing the "Code 33" report of "shots fired"—both of which put them on high alert for a danger to themselves and the community.  *Id.* ¶ 3.  When they first approached Arteaga, the officers were alone.  *See* Harding Decl., Ex. E (min. 4:06).  As the officers approached him, Arteaga did not obey their multiple commands to put his hands on his head and instead put his hand into his pocket and backed into the traffic lane.  O'Brien Decl. ¶ 6.  Officer Sarcos was especially concerned that he was reaching for his pocket—a fact she warned her fellow officers about multiple times.  Sarcos Decl. ¶ 9 (Arteaga putting his hand in his pocket was suspicion and potentially indicative that he was reaching for a weapon).

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

1    Although he eventually put his hands on his head (after multiple warnings to do so), Arteaga did so as he

2    turned his back to the officers, suggesting he may flee.  And, perhaps obviously, the officers were

3    performing a stop of a suspected active shooter in one of the most dangerous neighborhoods in San

4    Francisco: the Tenderloin.  O'Brien Decl. ¶ 2; Sarcos Decl. ¶ 2.  There is therefore no doubt that officers

5    reasonably suspected Arteaga to be armed and dangerous when they detained him.

6          Because of their reasonable suspicions, the manner in which the officers stopped him—including

7    by using handcuffs and a physical take-down—did not transform the stop into an arrest.  *See* Opp. at 5.

8          To start, "the use of handcuffs, *if reasonably necessary*, while substantially aggravating the

9    intrusiveness of an investigatory stop, does not necessarily convert a *Terry* stop into an arrest."  *United*

10   *States v. Franco*, 787 F. App'x 381, 384 (9th Cir. 2019) (citing *United States v. Taylor*, 716 F.2d 701,

11   709 (9th Cir. 1983)) (emphasis added); *see also Haynie v. Cnty. of Los Angeles*, 339 F.3d 1071, 1077

12   (9th Cir. 2003) ("A brief, although complete, restriction of liberty, such as handcuffing, during

13   a *Terry* stop is not a de facto arrest, if not excessive under the circumstances.").  Handcuffs here were

14   plainly "reasonably necessary" to prevent Arteaga from reaching for a gun—which, as we now know, he

15   had hidden in his jacket.

16         Nor did officers' use of physical force to detain Arteaga transform his stop into an arrest.  In

17   *Edwards*, for example, officers used "aggressive methods" by pointing their weapons towards the

18   arrestee, forcing him to kneel, and then handcuffing him.  *Edwards*, 761 F.3d at 981–82.  But the

19   methods were "reasonable and did not convert Edwards's detention into an arrest."  *Id.*  Among other

20   reasons, the officers had reasonable suspicion to believe Edwards was the person who "had been

21   shooting at passing cars just minutes before police arrived," and thus "could be armed and dangerous."

22   *Id.*  Given their "legitimate safety concerns," the officers were therefore justified to use "intrusive

23   measures to stabilize the situation before investigating further."  *Id.*  As in *Edwards*, the officers here

24   thought Arteaga had been "shooting at passing cars just minutes before" and only a few blocks away.

25   Their belief that he was armed and dangerous, coupled with seeing him put his hands in his pocket,

26   justified their tactics.

27

28

16

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

The officers here had more cause to believe Arteaga, who was reported to have fired shots ten minutes earlier, was armed and dangerous than in *United States v. Jacobs*, 715 F.2d 1343 (9th Cir. 1983), where a radio dispatch had informed the officer that the suspect was "possibly armed." Nevertheless, in *Jacobs*, an investigative stop did not become an arrest when an officer pointed his gun at the defendant and ordered her to "prone out." *Id.*   Contrary to the defendant's suggestion that officers here used some of the "most aggressive methods available to them," Opp. at 6, Officer O'Brien did not point weapons at Arteaga when he approached him. *See* Sarcos Decl., Ex. G (min. 00:01).  Even if he had, pointing weapons at a suspect can be justified if, as here, officers reasonably believe the suspect is armed and dangerous. *See United States v. Alvarez*, 899 F.2d 833, 893 (9th Cir. 1990) (no de facto arrest when officers approached vehicle with weapons drawn because officers reasonably believed he was armed with explosives).

Arteaga's evasiveness to the officers' commands also justified their tactics.  In *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983), for instance, the stop did not become a de facto arrest when officers required the suspect to remain prone and handcuffed until he was arrested.  The officers' actions were justified in part because the suspect had "disobeyed an order to raise his hands, and he made furtive movements inside the truck where his hands could not be seen." *Id.*  Similarly here, Arteaga evading Officer O'Brien's multiple commands and reach inside his pocket justified the use of reasonable force to control the situation.  As in *Taylor*, their actions "eliminated the possibility of an assault or attempt to flee"—which was especially important here given Arteaga did, in fact, have a gun.  Because their tactics were justified, the stop did not transform into an arrest.

*Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir. 1996) does not counsel otherwise. *See* Opp. at 6.  In *Lambert,* two men were stopped based on little more than a generalized description of the suspect; here, however, the officers suspected Arteaga for numerous additional reasons other than his appearance—including the suspect car closely matching the dispatch report, the close proximity in time and place to the reported shooting, and Arteaga's suspected connection to the suspect car.  In *Lambert*, too, the Ninth Circuit highlighted that "Washington and Hicks did nothing immediately prior to or during their confrontation with the police to justify [the officer's] use of a complete battery of intrusive

17

and threatening procedures in the context of a *Terry* stop."  As discussed, Arteaga's conduct here—including his evasiveness, potential flight, and reaching for his pockets—all amplified the officers' concerns for their safety.  Those actions were, in and of themselves, a crime.  *See* Cal. Penal Code § 148 (making unlawful anyone who "willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any of his or her office").

Because the original seizure of Arteaga was an investigatory stop, and not an arrest, only reasonable suspicion was needed.[5]  As already discussed, officers had reasonable suspicion to stop Arteaga as the road rage shooting suspect.

### C.     The Preliminary Pat-Down Search of Arteaga Was Not a Violation of the Fourth Amendment.

As noted, Officers O'Brien and Sarcos did not conduct a pat-down search of Arteaga, but instead turned Arteaga over to other colleagues who conducted a pat-down search on the sidewalk.   The defendant incorrectly describes this pat-down search on the sidewalk—conducted on someone believed to be armed and dangerous for officer safety reasons—as a "more invasive search."  Opp. at 7.

Long-standing precedent makes clear that the officers' reasonable suspicion that Arteaga was armed and dangerous justified a protective pat-down search of Arteaga to look for weapons.  *Terry v. Ohio*, 392 U.S. 1, 27 (1968) (reasonable search for weapons for officer protection where reason to believe the person is armed and dangerous); *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (evasive conduct of passenger, among other facts, gave reasonable suspicion to believe a pat-down search was necessary for officer safety).

The defendant's contention that the officers conducted a more "invasive search," Opp. at 7, rather than a protective pat-down search, is belied by a simple fact:  The officers did not find a gun during the protective pat-down, which, as we now know, was in Arteaga's jacket.  Nor did the officers find the white powdery substance or cash, later uncovered on Arteaga's person during an actual search of his person.[6]  In any event, because the officers did not find or seize any evidence during the sidewalk

---

[5] The government reserves the right to argue that the officers had probable cause at the initial encounter with Arteaga.  But the government does not think the Court needs to reach that determination.

[6] The defendant briefly notes that the officers' searched Arteaga's pocket (Opp. at 3), although it is not clear that the defendant is alleging a corresponding violation.  The Fourth Amendment allowed

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

1   pat-down search, there is nothing to suppress even if the search was overbroad.

2   **D.      Shortly After the Initial Stop, If Not Sooner, Officers Developed Probable Cause to Believe Arteaga Was the Road Rage Shooter.**

3   Shortly after the initial stop, Arteaga was firmly connected to the suspect car, which officers

4   confirmed was the same one involved in the shooting.  At this point—if not sooner—officers had

5   probable cause to believe Arteaga was the road rage shooter.

6   "The test for whether probable cause exists is whether 'at the moment of arrest the facts and

7   circumstances within the knowledge of the arresting officers and of which they had reasonably

8   trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had

9   committed or was committing an offense." *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005)

10  (citations and internal markings omitted).  "A determination as to whether probable cause exists requires

11  a 'practical, common-sense' decision based on the totality of the circumstances, including the veracity,

12  basis of knowledge and reliability of the information provided by informants. *See id.* (citing *Illinois v.*

13  *Gates,* 462 U.S. 213, 214 (1983)).

14   Shortly after the initial stop, between approximately 6:52 and 6:57 p.m., officers had three

15  critical facts that, layered onto the facts supporting reasonable suspicion, ripened their suspicions into

16  probable cause:

17  *First,* very shortly after he was pat-down searched, Arteaga made statements directly connecting

18  himself to the suspect car, which had visible front-end damage to it.  At around 6:47 p.m. (or

19  approximately three minutes after first approaching him), Arteaga stated—unprompted and not in

20  response to any police questioning about the car—that someone "hit my car," that he had "tried to

21  follow him looking," and "some people hit my car."  Custodio Decl. ¶ 6 and Ex. H (min. 2:55).[7]

22

23

24  officers to go inside the pocket, which they first patted down and then reached inside to see whether a
    hard object was a weapon. *See* Ex. H, at 2:20.  The officers appeared to find a cell phone, which they

25  immediately placed back in the pocket.  They reached inside the pocket after Officer Sarcos warned
    them about Arteaga reaching for his pockets.  This search was thus reasonably necessary to look for

26  weapons.  *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (pat down search proper if limited to what
    is necessary for the discovery of weapons that might be used to harm the officer or others nearby).

27  [7] Before making these statements, and as he was being patted down for weapons, Arteaga also
    stated "I got dope."  This was tantamount to an admission to possessing narcotics.  This gave officers

28  probable cause to believe Arteaga was violating California's drug laws.  *See* Cal. Health & Safety Code

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

1   Unsurprisingly, the defendant's statements describe exactly what happened at Turk and Van Ness:

2   Someone hit his car and Arteaga tried to follow the person up Van Ness Avenue.  Arteaga made his

3   statements on the sidewalk next to the white BMW—which had visible front-end damage to it.  *Id.*; *see*

4   *also* Sarcos Decl. ¶ 13 (image showing the BMW with visible front-end damage to it at the same time

5   defendant made these statements).

6         To be sure, these statements were made without *Miranda* warnings.  But "'[v]olunteered

7   statements of any kind are not barred by the Fifth Amendment' and failure to give *Miranda* warnings

8   does not affect the admissibility of such statements."  *United States v. Taylor*, 715 F. App'x 740, 741

9   (9th Cir. 2018) (unpublished) (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980)) (no error in admitting

10  spontaneous statements not the result of custodial interrogation).  Arteaga's statements were unprompted

11  and not in response to officer questioning and thus did not require *Miranda* warnings.  Although one

12  officer had earlier asked him "que tienes aqui" (i.e., "what do you have?") (Ex. H at min 2:09),

13  Arteaga's statements about being in a car collision were made just under a minute later and in no way

14  logically connected to that question (*id.* at min. 2:55).  He volunteered his connection to the car on his

15  own.

16        *Second*, shortly after Arteaga makes his statements, at 6:49 p.m., a bystander told Officer

17  Custodio that he had witnessed Arteaga place something under the front right tire of the BMW.

18  Although officers did not find anything under the tire, the bystander's statement further connected

19  Arteaga to the white BMW.

20        *Third*, between 6:52 (when the detectives arrived) and no later than 6:57 (when Officer O'Brien

21  was informed), Sgt. Delaney and Sgt. Kasper confirmed the white BMW was the same car they had seen

22  involved in the road rage shooting at Turk and Van Ness.  Although the darkness prevented a perfect

23  identification, Sgt. Kasper thought Arteaga looked "similar," including in stature, height, and skin tone,

24  to the road rage shooter.  Kasper Decl. ¶ 16.  Sgt. Delaney considered the clothing to be similar, too.

25  Delaney Decl. ¶ 9.

26

27

28  § 11350(a) (criminalizing the possession of controlled substances).

20

At the point the detectives confirmed that the BMW was the same one involved in the road rage shooting, the totality of the circumstances supported probable cause to believe Arteaga was the road rage shooter.  That different officers uncovered these additional facts is of no moment, as probable cause can be based the collective knowledge of all officers involved in the investigation, even if every fact is not communicated to every officer.  *See United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (describing the collective knowledge doctrine and its common applications).

### E.   The Officers' Subsequent Investigation That Uncovered the Ghost Gun on His Person and Narcotics in the BMW Was Justified Under the Fourth Amendment.

The defendant's motion focuses on the initial encounter (including the stop and preliminary pat-down search) and only vaguely challenges the remainder of the stop by arguing that "all evidence – including Mr. Arteaga's statements, the weapon, ammunition, casing, and narcotics – obtained after these Fourth Amendment violations must be suppressed as 'fruit of the poisonous tree.'"  Opp. at 7.  The defendant will face an uphill road in challenging the remainder of the stop, which was consistent with the Fourth Amendment at each step.

#### 1.   *The Officers' Investigation Into Arteaga's Identity Was Justified.*

The officers' subsequent investigation was impeded by Arteaga providing several fake names (Anthony Velasquez, Joseph Velasquez, and Anthony Cruz Velasquez) to investigators.  Asking Arteaga's name did not implicate the Fourth Amendment because the initial stop was based on reasonable suspicion.  *See Brown v. Texas*, 443 U.S. 47, 51-52 (1979).  As the Supreme Court has stated, "[t]he principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop" and "[o]btaining a suspect's name in the course of a *Terry* stop serves important government interests."  *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 186-87 (2004) (explaining that an identity request has an "immediate relation to the *Terry* stop's purpose, rationale, and practical demands").  Obviously, too, Arteaga providing fake names added to the probable cause to arrest Arteaga.  Not only is it a crime to provide fake names to the police during a detention, *see* Cal. Penal Code § 148.9, but doing so also demonstrates a consciousness of guilt.

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

2.     *Officers' Actions in Finding the Gun and Other Items on Arteaga's Person Were Proper.*

No warrant was needed to find the ghost gun in Arteaga's jacket.  As the body-worn camera footage shows, Officer Hargreaves found the ghost gun through a "plain feel" of the defendant's outer clothing as he was lifting Arteaga onto the gurney.  Hargreaves Decl. ¶ 3, Ex. J (min. 30:00).  It is well-established that a "plain feel" for contraband during a protective pat-down search does not violate the Fourth Amendment.  *Minnesota v. Dickerson*, 508 U.S. 366, 375–76 (1993) (warrantless seizure appropriate for "tactile discoveries of contraband" pursuant to a pat-down of a suspect's clothing).  Finding the gun only added to officers' belief that Arteaga was the road rage shooter.

Although the facts were fluid—and interrupted by Arteaga's need for medical attention—at the point officers found the ghost gun in Arteaga's jacket, Arteaga was under arrest.  Incident to arrest, the officers searched Arteaga's person, where they found evidence of drug dealing (including cash and suspected narcotics).  Because the officers had probable cause to believe he was the road rage shooter at this point, officers did not need a warrant to search him incident to arrest.  *See United States v. Robinson*, 414 U.S. 218, 224 (1973) ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.").

3.     *No Warrant Was Needed to Search the BMW Leading to the Discovery of Over Two Pounds of Fentanyl*

The officers lawfully searched the BMW that lead to the discovery of over two pounds of fentanyl, among other drugs, and a shell casing that matched the gun found on Arteaga's person.

*First*, the defendant (likely strategically but nevertheless notably) has not claimed that he has standing to contest the search of the car—which was registered to someone else and thus may have been stolen.  He thus does not have a reasonable expectation of privacy in the car to claim a Fourth Amendment violation for its search.  *See United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990) (no standing to contest search of truck where defendant did not show his possession of the truck from the registered owners was lawful).

*Second*, officers properly searched the BMW under the automobile exception to the Fourth Amendment's warrant requirement.  By the time of the car search, Sgt. Delaney and Sgt. Kasper had

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

1   confirmed the white BMW was the same car involved in the road rage shooting, meaning officers had

2   ample probable cause to believe that it was involved in criminal activity and thus may have evidence of

3   such crimes (including, for instance, having shell casings from the shooting).  By the time of the car

4   search, too, Cooper the K-9 had sniff-search alerted to the presence of drugs.  This only added to the

5   officers' objectively reasonable belief that they had probable cause the BMW contained evidence of a

6   crime.[8]  Probable cause thus justified the car search.  *See California v. Acevedo*, 500 U.S. 565, 569

7   (1991) (reaffirming that a warrantless search of an automobile, based on probable cause to believe that

8   the vehicle contained evidence of a crime, did not violate the Fourth Amendment).

9          *Third,* officers were entitled to conduct an inventory search of the BMW, which was left

10   abandoned when Arteaga went to the hospital for purportedly ingesting fentanyl.  *United States v.*

11   *Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016) (community caretaking doctrine allows police to, without a

12   warrant, impound and search a vehicle).

13          **F.       The Court Should Deny Defendant's Motion Without an Evidentiary Hearing**

14          The Court has everything it needs to make a decision on the defendant's motion: the surveillance

15   footage showing Arteaga touching the BMW when he was first approached; the declarations of seven

16   police officers; the body-worn camera footage of six officers; three dispatch recordings; and the certified

17   CAD.  Given the volume of evidence already presented to the Court, an evidentiary hearing that takes

18   seven-plus active-duty police officers off the streets is not a valuable use of anyone's time or resources.

19          In any event, it does not appear that any of the core facts are reasonably in dispute and any

20   disputed facts can be answered by reviewing the body-worn camera footage already submitted to the

21   Court.  An evidentiary hearing is not warranted under such circumstances.  *See United States v. Howell*,

22   231 F.3d 615, 620-21 (9th Cir. 2000) ("An evidentiary hearing on a motion to suppress need be held

23   only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable

24   the trial court to conclude that contested issues of fact exist."); *see also United States v. Solorio-*

25

26

_____

27   [8] The defendant had no privacy interest in the narcotics detected by the dog to contest Cooper's
     sniff search.  *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (narcotics-detection dog during lawful

28   traffic stop does not implicate legitimate privacy interests).

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO

1   *Mendoza*, 731 F. App'x 583, 586 (9th Cir. 2018) (unpublished) ("To obtain an evidentiary hearing on a
2   motion to suppress, a defendant must establish contested issues of material fact.").

3        If the Court chooses to order an evidentiary hearing (it should not), the government respectfully
4   requests the Court direct the parties to particular issues on which to present evidence.  Narrowing the
5   issues in dispute at an evidentiary hearing will help conserve everyone's time and resources.

6   **IV.    <u>CONCLUSION</u>**

7        The Court should deny the defendant's motion to suppress without an evidentiary hearing.

8   DATED:        September 29, 2022                    Respectfully submitted,
9

10

11                                           _____/s/_____
                                             LAUREN M. HARDING
12                                           Assistant United States Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPP. TO SUPPRESSION MOTION
Case No. 3:22-cr-00101 WHO