UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>WILMER ARTEAGA,<br><br>  Defendant. | Case No. 22-cr-00101-WHO-1<br><br>**ORDER DENYING MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 32 |

**INTRODUCTION**

At about 6:30 p.m. on November 9, 2021, at the intersection of Van Ness Avenue and Turk Street, San Francisco Police Department officers observed the driver of a white BMW get out of his car, pistol in hand, and fire two shots at another car in an apparent road rage incident. The officers reported the incident and tried to follow the BMW. They lost track of it after it turned eastbound off Van Ness on Ellis Street. Within ten minutes, other officers identified what they thought was the subject car parked on Ellis Street (about three blocks from where the incident took place) and a person who had been in it. They seized and searched that person, defendant Wilmer Arteaga.[1] During the searches of Arteaga's person and the BMW, Arteaga made incriminating statements and the officers found a ghost gun, fentanyl, cocaine, methamphetamine, heroin, marijuana, and a fired cartridge.

Arteaga contends that the seizure and searches were unconstitutional because the officers lacked reasonable suspicion and probable cause. He seeks to suppress all evidence from the stop. As set forth below, I find that the officers had reasonable suspicion to seize Arteaga and that their

---

[1] According to the motion to suppress, the defendant's true surname is Cruz Velasquez, but the parties refer to him as Arteaga to maintain consistency with the police reports. Mot. at 1 n.1.

1  reasonable suspicion had ripened into probable cause by the time of the searches. The motion to
2  suppress is **DENIED.**

## FACTUAL BACKGROUND

San Francisco Police Department ("SFPD") homicide inspectors Sergeant Jon Kasper and Sergeant Kyra Delaney were driving on Turk Street in an unmarked police vehicle on November 9, 2021, at around 6:30 p.m., when they saw two cars engaging in road rage in front of them. *See* Declaration of Kyra Delaney ("Delaney Decl.") [Dkt. No. 38-1] ¶ 3; Declaration of Jon Kasper ("Kasper Decl.") [Dkt. No. 38-2] ¶ 3. One car was a white BMW and the other a dark colored SUV. *Id.*

At approximately 6:32 p.m., at the intersection of Van Ness Avenue and Turk Street, the SUV stopped in the left lane and immediately reversed into the front-end of the BMW, which was positioned behind it. Delaney Decl. ¶ 4; Kasper Decl. ¶ 5. Kasper and Delaney, who were a few car lengths away, saw the driver of the BMW exit the car holding a gun and fire two shots toward the SUV. Delaney Decl. ¶¶ 5–6; Kasper Decl. ¶¶ 6-7. The inspectors followed the white BMW for a few blocks before losing sight of it. Delaney Decl. ¶ 6; Kasper Decl. ¶ 7. As they were following the car, Kasper reported the shooting to dispatch. Kasper Decl. ¶¶ 8–9, Ex. A (certified CAD); Ex. B (recorded call to dispatch). Kasper described the suspect's car as a white, two-door BMW with license plate 8VIW842, which was the "best he could get" and was, as he explained to dispatch, likely slightly off. Kasper Decl. ¶¶ 9–13, Ex. B at 1:17–1:26 (confirming license plate number with dispatch while explaining "I'm messing up the plate; that's the best I could get"). He said that the driver was a black male adult. Kasper Decl. ¶ 11. He reported that the BMW's last seen location was Ellis Street and that the BMW likely had front-end damage to it. *Id.* ¶¶ 9, 12.

At around 6:33 p.m., dispatch reported a "Code 33"[2] alert involving "shots fired" out of Eddy and Van Ness. *See* Ex. C (dispatch call). Dispatch again reported the shooting at 6:35 p.m. as involving a white BMW (8VIW842), possibly a four-door, with a "BM" (i.e., black male)

---

[2] A "code 33" is a radio code denoting an emergency broadcast for a specific incident that directs officers to turn their immediate attention to an active, dangerous situation. *See* Declaration of Officer Daniel O'Brien ("O'Brien Decl.") [Dkt. No. 38-3] ¶ 3.

2

suspect. *See id.*; Ex. D at 1:26–1:42. Dispatch reported that the car had front-end damage. Ex. D at 1:49. The reports were from both a "5H5" (i.e., the homicide inspectors) and a "909" (i.e., a civilian). *Id.* at 2:10–2:14.

At 6:35 p.m., SFPD police officers Daniel O'Brien and Sonya Sarcos, who were patrolling nearby in the Tenderloin neighborhood, heard the Code 33 alert and responded immediately. O'Brien Decl. ¶¶ 3–4; Declaration of Sonya Sarcos ("Sarcos Decl.") [Dkt. No. 38-4] ¶¶ 3–4. At around 6:43 p.m.—fewer than ten minutes after first hearing dispatch's description of the suspect car—O'Brien saw a white BMW parked on Ellis Street, about three blocks away from the initial incident. O'Brien Decl. ¶¶ 5-6; Sarcos Decl. ¶ 6. Although the parked BMW was a 2-door model and dispatch had reported that the suspect's car was possibly a four-door BMW, the last three digits of the parked BMW's license plate (942) closely matched the last three digits broadcast by dispatch (842). *Id.*; Ex. D. Both officers thought it looked like the suspect car, especially since, in Sarcos's experience, it was not common to see white BMWs in the Tenderloin. O'Brien Decl. ¶ 5; Sarcos Decl. ¶ 6. According to Sarcos, when they saw the parked BMW, O'Brien told her that he saw someone inside the car. Sarcos Decl. ¶ 5. In O'Brien's initial incident report, however, he noted that he was "not able to see if the vehicle was occupied" during their initial drive-by. *See* Ex. A to the Declaration of Gabriela Bischof (incident report) [Dkt. No. 33-1] at WA-00022. The officers made a U-turn and turned on their flashing lights. Sarcos Decl. ¶ 7. Both Sarcos and O'Brien were wearing body cameras, which were turned on and recorded the ensuing events.

After they parked behind the BMW, the officers approached the BMW on foot. O'Brien Decl. ¶ 7. Sarcos declared that she "think[s] she saw the front passenger door open and close," while O'Brien declared that he saw the BMW's internal light turn on and off, which suggested to him that the car had been recently exited. O'Brien Decl. ¶ 7; Sarcos Decl. ¶ 7. Surveillance footage from a nearby building shows that Arteaga was inside the vehicle when the officers first drove by and that he exited the vehicle as the officers were executing the U-turn. Ex. E (surveillance footage) at 3:00–3:54. The surveillance video shows that the BMW's internal lights were on as the officers drove towards the BMW and that the internal lights remained on while the officers approached the BMW on foot. *Id.* at 4:06–4:10. As the officers approached the BMW,

3

they saw Arteaga, who is Hispanic, standing "within an arm's distance" of the front passenger side of the BMW. O'Brien Decl. ¶ 7; Sarcos Decl. ¶ 7; *see also* Ex. E at 4:07. The officers suspected that he was the road rage shooter and that he was armed and dangerous. O'Brien Decl. ¶ 7; Sarcos Decl. ¶ 8.

As O'Brien approached Arteaga, he immediately commanded him to stop walking and to place his hands on his head. O'Brien Decl. ¶ 8; Ex. F (O'Brien's body-worn camera footage) at 0:38. Arteaga began walking towards to the street while slightly raising one of his hands. Ex. F at 0:46. Sarcos observed Arteaga put his hand in his pocket, which she found suspicious and believed to be "potentially indicative that he was reaching for a weapon." Sarcos Decl. ¶ 9. O'Brien and Sarcos repeated their commands for Arteaga to put his hands on his head multiple times, at which point Arteaga briefly put his hands on his head and then removed them again. *Id.*; O'Brien Decl. ¶ 8.

Arteaga, who had been moving back and forth around the front of the BMW, then began walking towards the street with his back to the officers, which suggested to O'Brien that he might flee. Ex. F at 0:46–0:53; O'Brien Decl. ¶¶ 8–9. As Arteaga questioned, "What happened? What did I do?" O'Brien forcibly pushed him towards the ground. Ex. F at 0:53–0:59; O'Brien Decl. ¶ 9. O'Brien and Sarcos then handcuffed Arteaga while O'Brien scolded him, "Don't fight the police" and "You have to listen." Ex. F. at 1:10–1:21; O'Brien Decl. ¶ 10. After Arteaga was handcuffed, officer Victor Custodio pulled him to the sidewalk. *See* Declaration of Victor Custodio ("Custudio Decl.") [Dkt. No. 38-5] ¶ 3; Ex. F at 1:30.

By 6:46 p.m., additional officers had arrived on the scene. Ex. F at 3:03. Custudio and three or four other officers searched Arteaga for weapons. *See* Custudio Decl. ¶ 4; Ex. G at 1:20–2:08. While Custodio characterized the search as a pat-down search that was limited to Arteaga's outer clothing, *see* Custudio Decl. ¶ 4; Sarcos's body-camera footage shows that the officers repeatedly lifted up his jacket. Ex. G at 1:20–2:08. Sarcos told Arteaga that "If you have drugs we don't care" and another officer asked "Que tienes aqui?" while frisking Mr. Arteaga's jacket

4

pocket. *Id.* at 1:35 and 2:05. As the officers frisked him, Arteaga told them "I got dope."[3] Custodio Decl. ¶ 5; Ex. H (Custodio body-camera footage) at 2:15. No physical evidence was obtained during the frisk.

At around 6:47 p.m., almost immediately after the officers ended their frisk, Arteaga told the officers that someone "hit my car," that he had "tried to follow him looking," and "some people hit my car." Custodio Decl. ¶ 6; Ex. H at 2:51-3:21. Arteaga made these statements on the sidewalk next to the white BMW that had visible front-end damage to it. Custodio Decl. ¶ 6; *see also* Sarcos Decl. ¶ 13.

Immediately after Arteaga told the officers that "some people hit my car," O'Brien asked him about his identity. Ex. H at 3:21; O'Brien Decl. ¶ 13. Arteaga told them that he was "Anthony Velasquez" and gave a date of birth of October 17, 1992. O'Brien Decl. ¶ 13; Ex. F at 4:13–4:35. O'Brien did not get any obvious matches after entering that information into law enforcement databases in his patrol vehicle. O'Brien Decl. ¶ 13. O'Brien also searched the license plate and VIN of the BMW and it returned to someone other than "Anthony Velasquez," which led him to believe that Arteaga had provided a false name. *Id.* Seven minutes later, Arteaga told him that his name was "Joseph," which also did not yield any obvious matches. *Id.* ¶ 14.

Some time later, a man standing nearby told Custodio something to the effect of "check under the tires," gesturing at the BMW.[4] Custodio Decl. ¶ 7; Ex. H at 5:09. The man confirmed that he meant the front right tire. *Id.* at 5:16. Custodio understood the man to say that he had witnessed Arteaga place something under the front tire of the BMW, but when officers searched under the tire, they did not find anything. Custodio Decl. ¶¶ 7–8.

---

[3] The defense has reserved the right to argue that the incriminating statements that Arteaga made about possessing "dope" were taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1996) in a later motion. Reply at 9 n.1.

[4] Custodio says that this incident occurred at 7:49 p.m., which I presume to be a typo because the key fob had been found and Arteaga was being transported to the hospital by 7:20 p.m. *Compare* Custodio Decl. ¶ 7 *with* Tursi Decl. ¶¶ 3–4; Opp. at 6. In any event, the precise timing of this event does not bear on my analysis because—as discussed below—I find that the officers had probable cause prior to this.

5

By 6:52 p.m., the homicide inspectors who had witnessed the shooting were on scene. Ex. F at 9:30 (showing the inspectors had arrived). They each identified the BMW as the same one involved in the shooting. Delaney Decl. ¶ 8; Kasper Decl. ¶ 14. At 6:57 p.m., O'Brien was told that Delaney had confirmed that the car was the suspect car. O'Brien Decl. ¶ 15. The detectives also thought Arteaga looked similar to the suspect: according to Delaney, Arteaga's clothing was similar. Delaney Decl. ¶ 9. And according to Kasper, Arteaga looked similar in stature, height, and skin tone. Kasper Decl. ¶ 15.

At 7:03 p.m., Arteaga told the officers that he had swallowed fentanyl. Ex. I (Parker body-camera footage) at 15:45; Declaration of Louis Hargreaves ("Hargreaves Decl.") [Dkt. No. 38-7] ¶ 3. An ambulance arrived at around 7:07 p.m. and a medic attended to Arteaga around a minute later. Ex. I. at 21:20.

At around 7:15 p.m., officers performed a gun-shot residue test on Arteaga. *See* Ex. J (Hargreaves body-worn camera footage) at 29:00. At around 7:17 p.m., as Arteaga was being loaded onto the gurney to get into the ambulance, Officer Louis Hargreaves felt a heavy, hard object inside Arteaga's person that he "immediately recognized" as a gun. Hargreaves Decl. ¶ 3. He reached inside Arteaga's jacket and found a pistol, later identified as a ghost gun. *Id.*; Ex. J at 30:00–30:21. Officers then searched Arteaga incident to arrest and found, among other things, $3428 in cash, marijuana, and three small clear bags of a white powdery substance. *See, e.g.*, Ex. A (incident report) [Dkt. No. 33-1] at WA-00019–21.

After Arteaga had been placed on the gurney, Sergeant Michael Tursi found the keys to the BMW next to the gurney where Arteaga had been searched. Declaration of Michael Tursi ("Tursi Decl.") [Dkt. No. 38-6] ¶ 4. Although Tursi did not see the key fob fall from Arteaga's pocket, the placement of the fob by the gurney "strongly suggest[ed]" to him that it had fallen from Arteaga's pocket while the officers were searching him. *Id.*

At some point, a certified narcotic dog named Cooper sniff-searched the outside of the BMW and alerted to the presence of drugs. Ex. A at WA-00022; *see also* Opp. at 7, 23. A subsequent search of the BMW found nearly 2 pounds of fentanyl in 55 different bags, along with

cocaine, methamphetamine, heroin, and marijuana. Opp. at 7. Officers also found one fired cartridge casing that matched the gun found in Arteaga's jacket. *Id.*

## PROCEDURAL BACKGROUND

On December 27, 2021, the government filed a complaint and an arrest warrant issued against Arteaga. [Dkt. No. 1]. On August 25, 2022, Arteaga moved to suppress the evidence arising from the purportedly unlawful seizure and searches conducted on November 9, 2021. Motion to Suppress ("Mot.") [Dkt. 32]. In conjunction with the government's opposition, it submitted declarations from seven officers involved in the seizure and searches; the body-worn camera footage of six officers; three dispatch recordings; and surveillance footage from a building on the street. *See* Dkt. Nos. 37–38. I heard argument on November 3, 2022.

## LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches conducted without a warrant "are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The government bears the burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement. *United States v. Job*, 871 F.3d 852, 860 (9th Cir. 2017) (citing *Scott*, 705 F.3d at 416).

## DISCUSSION

To determine the constitutionality of the officers' warrantless seizure and subsequent searches of Arteaga and the BMW, I must determine the point at which Arteaga was seized, whether he was merely seized or actually arrested when the officers forced him to the ground and handcuffed him, and whether the officers had reasonable suspicion or probable cause at the time of the seizure and subsequent searches in question. I address each of these questions in turn below.

### I.  ARTEAGA WAS SEIZED WHEN O'BRIEN FORCED HIM TO THE GROUND.

The parties dispute the precise moment of seizure. The defense contends that Arteaga was seized for Fourth Amendment purposes within the first two seconds of his encounter with law

7

1   enforcement when O'Brien ordered him to put his hands on his head and stop moving away from
2   him. Reply at 1; *see also* Ex. F at 0:37. The government responds that Arteaga was seized once
3   he was placed in handcuffs, which occurred about forty seconds later. Opp. at 15; *see also* Ex. F
4   at 1:17. I conclude something different: Arteaga was seized when O'Brien forced Arteaga to the
5   ground, which occurred in between these two events. Ex. F at 0:57.

A person is seized within the meaning of the Fourth Amendment "when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (internal citation and quotation omitted) (cleaned up). "A person's liberty is restrained when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). "[A] seizure does not occur if, in response to a show of authority, the suspect does not yield; in that event, the seizure occurs only when the police physically subdue the subject." *United States v. Santamaria-Hernandez*, 968 F.2d 980, 983 (9th Cir. 1992) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

Arteaga was not seized by O'Brien's commands because Arteaga did not comply with them. *See Santamaria-Hernandez*, 968 F.2d at 983 (explaining that a seizure does not occur if a suspect does not comply with police orders); *cf. United States v. Brown*, 996 F.3d 998, 1003, 1006 (9th Cir. 2021) (finding that seizure occurred when officer ordered defendant to stand up and turn around and defendant complied with order). As soon as O'Brien exited his patrol vehicle, he ordered Arteaga to put his hands on his head and to stop walking. Ex. F at 0:37. While Arteaga turned back towards O'Brien and eventually placed his hands on his head, O'Brien ordered him to do so *five times* before he complied. *Id.* at 0:52. And even after Arteaga put his hands on his head, he had turned and was moving away from O'Brien in defiance of O'Brien's order to stop walking. *Id.* at 0:52–0:56. Because Arteaga did not obey, he was not seized by O'Brien's commands. But once O'Brien forcibly pushed him to the ground, no reasonable person would have felt free to leave the scene. *Washington*, 387 F.3d at 1068. As a result, Arteaga was seized

8

at the point in which O'Brien pushed him to the ground.  Ex. F at 0:57.

## II.     ARTEAGA WAS NOT ARRESTED WITHIN THE FIRST MINUTE OF THE STOP.

The defense contends that O'Brien's show of force and use of handcuffs converted the investigatory stop into an arrest.  Mot. at 5.  But because O'Brien and Sarcos reasonably believed that there may be a threat to their safety, Arteaga was not placed under arrest by the officers' use of force.

There is no bright-line rule to determine when an investigatory stop becomes an arrest. *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988).  "The totality of the circumstances determines whether and when an investigatory stop becomes an arrest." *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014).  In looking at the totality of the circumstances, I examine two components of the detention.  *Id.*  First, I consider "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted." *Id.* (quoting *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996)).  Second, I look at "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id.* (quoting *Lambert*, 98 F.3d at 1185). The second inquiry regarding officer safety "frequently proves determinative." *Edwards*, 761 F.3d at 981 (citation omitted).  "In short, we decide whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances.*" *Lambert*, 98 F.3d at 1185 (citation omitted) (emphasis in original).

As a result, "while certain police actions constitute an arrest in certain circumstances, e.g., where the 'suspects' are cooperative, those *same* actions may *not* constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists." *Id.* (emphasis in original).  "The relevant inquiry is always one of reasonableness under the circumstances." *Allen v. City of Los Angeles*, 66 F.3d 1052, 1057 (9th Cir. 1995) (citation omitted).

In light of the circumstances leading up to the investigatory stop here, I conclude that

Arteaga was seized but not arrested during the first sixty seconds of his encounter with O'Brien and Sarcos. There is no doubt that the police used intrusive, aggressive measures: O'Brien pushed Arteaga to the ground within thirty seconds of leaving his patrol vehicle, *see* Ex. F at 0:53–0:59, and O'Brien and Sarcos handcuffed Arteaga a mere twenty seconds after that. *Id.* at 1:10–1:21. The government concedes that the officers used "forceful means" to detain Arteaga. Opp. at 15. Viewed in isolation, the officers' actions would likely have constituted an arrest, as Arteaga argues.

I conclude, however, that the officers' actions were justified in light of their legitimate concern for safety. The Ninth Circuit has "permitted the use of intrusive means to effect a stop where the police have information that the suspect is currently armed or the stop closely follows a violent crime." *United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001). "Under such circumstances, holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest." *Id.* Courts have allowed such intrusions on a suspect's liberty during a *Terry* stop where there is a legitimate concern for the officer's safety. *See United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) (upholding stop as a *Terry* stop rather than an arrest where police officers forced suspects to exit car and lie down on pavement at gunpoint); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1321 (9th Cir. 1995) (upholding investigatory stop where, following vehicle stop, officers surrounded car with weapons drawn); *United States v. Alvarez*, 899 F.2d 833, 838–39 (9th Cir. 1990) (finding totality of circumstances justified a stop under *Terry* where police ordered suspect in car to keep hands in view, approached vehicle with their weapons drawn and ordered suspect out of car); *United States v. Rousseau*, 257 F.3d 925, 930 (9th Cir. 2001) (upholding investigatory stop where officer detained suspect at gunpoint where officer had reason to believe that suspect had committed a violent crime "only minutes earlier").

When O'Brien and Sarcos first encountered Arteaga, they reasonably believed that he was armed and dangerous given his proximity to the white BMW and the dispatch reports of shots fired from a white BMW a mere eight minutes earlier and three blocks away. *See* Section III below (discussing officers' reasonable suspicion); *see also* O'Brien Decl. ¶¶ 3, 7; Sarcos Decl.

10

¶¶ 3–8. As the officers approached Arteaga, he did not follow their commands to put his hands on his head and to stop walking—instead, he moved away from them while raising and lowering his hands, and eventually turned his back to the officers which indicated to O'Brien and Sarcos that he was preparing to flee.[5] O'Brien Decl. ¶ 8; Sarcos Decl. ¶ 9. Although handcuffing is not part of a typical *Terry* stop, it was justified in light of the officers' reasonable belief that Arteaga was connected to the shooting that occurred just a few minutes earlier. *See Edwards*, 761 F.3d at 982 (finding that officers' handcuffing was justified where defendant "was the only person in the vicinity of the liquor store who fairly matched the description of a man who reportedly had been shooting at passing cars just minutes before police arrived"); *see also Miles*, 247 F.3d at 1013 (permitting use of handcuffs to effect stop where police believe suspect is armed).

Under the circumstances here, I conclude that the officers' intrusive measures were justified. Arteaga was seized but not arrested at the moment that he was pushed to the street.

### III. THE OFFICERS HAD REASONABLE SUSPICION TO SEIZE ARTEAGA.

The constitutionality of the investigatory stop hinges on whether O'Brien and Sarcos had reasonable suspicion that Arteaga was engaged in criminal activity. For the reasons explained below, I conclude that they did.

While police generally need probable cause to search or seize a person, there is a limited exception for brief investigatory stops "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot[.]" *Terry v. Ohio*, 392 U.S. 1, 30 (1968). "In contrast to a full-blown arrest, an investigatory stop need only be justified by reasonable suspicion." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) (citing *United States v. I.E.V.*, 705 F.3d 430, 434–35 (9th Cir. 2012)). Although less stringent than probable cause, reasonable suspicion requires that officers have "specific, articulable facts which, together with objective and reasonable inferences, form the basis

---

[5] The defense contends that "rather than turning away, Mr. Arteaga actually turned completely around," which would undermine O'Brien's purported belief that Arteaga was intending to flee. Reply at 8. From the body camera footage, it is not clear whether Arteaga turned around or if he just glanced over his shoulder at O'Brien. Ex. G at 0:04; Ex. F at 0:55. In any event, the footage shows that Arteaga was moving away from O'Brien at the time that O'Brien pushed him down. *Id.*

11

for suspecting that the particular person detained is engaged in criminal activity." *Id.* (quoting *Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011)).  Reasonable suspicion is assessed under the "totality of the circumstances" to see whether the detaining officer had a "particularized and objective" basis for suspecting legal wrongdoing.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citation omitted).

I find that there were numerous articulable facts that formed the basis for O'Brien's and Sarcos's reasonable suspicion that Arteaga was involved in the road rage at the moment of seizure. These facts include:

- The car—including its make (BMW) and color (white)—closely matched dispatch's description of the car involved in the road rage shooting;
- The BMW had a very similar license plate, whose last three digits (942) closely matched those reported over dispatch (842);
- The BMW was parked at 710 Ellis Street, which was three blocks away from where the shooting took place;
- Officers O'Brien and Sarcos approached Arteaga fewer than ten minutes after dispatch had reported the shooting;
- It was not common to see white BMWs in the Tenderloin;
- Arteaga was stopped in a high-crime neighborhood;
- According to Sarcos, O'Brien said that he saw someone inside the BMW when they first drove by it; when the officers approached, Arteaga was standing within an arm's length of the BMW and the BMW's lights had turned on and off, suggesting to Officer O'Brien that Arteaga had recently exited the car;
- When approached, Arteaga did not immediately obey the officers' multiple commands to put his hands on his head and instead entered the traffic lane and turned his back on the officers, which suggested to O'Brien and Sarcos that he was about to flee.

Taken together, these facts provide reasonable suspicion.  I find that the officers lawfully seized Arteaga to investigate whether he was the road rage shooter.

The defense attacks the officers' reasonable suspicion on four grounds: the officers lacked

reasonable suspicion because Arteaga was "merely present" by the BMW; the description of the suspect as a black man was vague; Arteaga did not match the description; and the officers did not locate a weapon after initially frisking him. Mot. at 8–12. None of these grounds dispels the reasonable suspicion created by the facts listed above.

### A. Arteaga Was Not Merely Present by the Car.

The defense contends that Arteaga's mere presence near the suspect vehicle cannot support reasonable suspicion because there was an insufficient nexus between him and the BMW. It is correct that, as a general proposition, a person's mere presence near criminal activity alone does not create probable cause to search or arrest that person. *United States v. Buckner*, 179 F.3d 834, 838 (9th Cir. 1999). But that legal principle is irrelevant to the facts here, as shown by the defense's reliance on *Ybarra v. Illinois*, 444 U.S. 85 (1979).

In *Ybarra*, police learned that a bartender was selling heroin out of a tavern and obtained a warrant to search the bartender and the tavern. 444 U.S. at 87–88. When law enforcement arrived at the tavern to execute the warrant, they announced upon entering that they would conduct a "cursory search for weapons" of each of the nine to thirteen customers present in the tavern. *Id.* at 88. Ybarra, who was a customer at the tavern, was frisked twice. *Id.* at 88–89. The Supreme Court found that both frisks were unconstitutional because the police officers lacked individualized suspicion to believe that Ybarra was armed and dangerous. *Id.* at 92–93.

*Ybarra* is not analogous because O'Brien and Sarcos reasonably believed that Arteaga had recently exited from the BMW and was not a "mere bystander" who was adjacent to it. The officers submitted sworn declarations under penalty of perjury identifying facts that led them to believe that Arteaga had recently exited the vehicle, such as seeing someone inside the BMW, seeing someone exit the BMW, and seeing the BMW's internal lights illuminated. Sarcos Decl. ¶¶ 5, 7; O'Brien Decl. ¶ 7. These declarations are corroborated by the surveillance footage from the nearby building. Ex. E. While Arteaga was not the only person next to the BMW, *see* Ex. F at 0:39–0:45, he was by far the closest to it—the only other person who appears to be present was huddled against the side of the building, whereas Arteaga was standing within an arm's length of the BMW at the time that the O'Brien and Sarcos approached. O'Brien Decl. ¶ 7. The evidence

13

fairly supports the officers' belief that Arteaga had recently exited from the car and was not "merely present" at the scene.

### B. The Reported Description of the Suspect Did Not Dispel Reasonable Suspicion.

The defense asserts that the reported description of the suspect as a "black man" is both vague and does not apply to Arteaga. Mot. at 9–11. Were these the only facts that led the officers to seize Arteaga, then the seizure would have been unconstitutional. "[R]easonable suspicion may not be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (internal citation and quotation marks omitted). But as explained above, the officers reasonably believed that Arteaga had just exited the BMW, and as a result reasonably believed that Arteaga was connected with the road rage shooting.

The defense overemphasizes the mismatch between dispatch's report of the suspect as a black man and Arteaga's race.[6] According to the defense, this "critical factual discrepancy alone dispelled any reasonable suspicion that Mr. Arteaga was the shooter." Mot. at 10. But this approach improperly treats one factor as controlling, which is flatly inconsistent with the Court's guidance. *See Arvizu*, 534 U.S. at 274 ("The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase . . . *Terry* [] precludes this sort of divide-and-conquer analysis."). Both officers declared under penalty of perjury that they suspected that Arteaga was the shooter when they saw him by the BMW, even though dispatch had reported that a black man was the suspect. O'Brien Decl. ¶ 7; Sarcos Decl. ¶ 8. Sarcos, who perceived Arteaga to be "dark-skinned" and "either black or Hispanic," explained that, in her experience, "it is difficult to distinguish race among individuals with similar complexions at night." Sarcos Decl. ¶ 8.

More fundamentally, I find that the officers would have been justified in detaining *anyone* who appeared to be connected to the BMW, which the officers reasonably believed had been

---

[6] In the same vein, the defense incorrectly argues that Arteaga's "heavy Spanish accent" should have prompted the officers to realize that he was not the suspect that they sought. Reply at 5. But race, ethnicity, accent, and language are independent aspects of identity, and dispatch did not report on the shooting suspect's accent.

involved in a shooting just ten minutes earlier. Even if Arteaga's race lessened the likelihood that Arteaga was the shooter, it did not remove the possibility that he was still involved in the road rage incident. Despite the vague description of the suspect, O'Brien and Sarcos reasonably suspected that Arteaga was connected to the shooting and thus could constitutionally detain him to investigate.

### C. The Officers' Reasonable Suspicion Did Not Dissipate After the Frisk.

Finally, the defense contends that suspicion should have dissipated once the officers frisked him and failed to find a weapon. Mot. at 12. But the defense does not explain why the officers' failure to find a weapon during the frisk would have led them to believe that he was not involved with the shooting. The officers reasonably could have believed that Arteaga had hidden the weapon in several places, including in the BMW. I conclude that the officers could constitutionally detain Arteaga even after the officers failed to find a weapon during the frisk.

## IV. THE OTHER SEARCHES AT ISSUE WERE CONSTITUTIONAL.

The defense challenges the other searches based on the fruit of the poisonous tree doctrine. *See* Mot. at 12; Reply at 10. These searches included: (1) a frisk on the sidewalk; (2) a search of Arteaga's person following the discovery of the ghost gun; and (3) the automobile search of the BMW and his backpack. For the reasons discussed below, the fruit of the poisonous tree doctrine does not apply and the first two searches were constitutional: the frisk was justified because the police reasonably suspected that Arteaga was armed and dangerous; and the search of Arteaga's person was conducted as a search incident to arrest. I do not reach the constitutionality of the automobile search because Arteaga has not shown that he has standing to challenge that search.

### A. The Fruit of the Poisonous Tree Doctrine Does Not Apply.

"It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" *United States v. Ramirez*, 976 F.3d 946, 959 (9th Cir. 2020) (quoting *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007)). While the defense contends that "all searches subsequent to his initial unlawful detention are tainted," *see* Reply at 10, this argument

15

relies on the incorrect premise that the seizure was unconstitutional. Because the officers had reasonable suspicion to detain Arteaga, the fruit of the poisonous tree doctrine does not apply.

### B. The Officers Could Frisk Arteaga Because They Reasonably Believed Arteaga Was Armed and Dangerous.

"Under the Fourth Amendment, a search for weapons is permissible 'for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual.'" *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1021 (9th Cir. 2009) (citing *Terry*, 392 U.S. at 27); *see also Ybarra,* 444 U.S. at 94 ("The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked . . ."). The defense argues that the frisk on the sidewalk was unconstitutional because the officers did not have reason to believe that he was armed and dangerous.[7] Mot. at 9. But as explained above, O'Brien and Sarcos reasonably believed that Arteaga was armed and dangerous. *See* Section III, *supra*. This means that the officers could lawfully pat down the exterior of Arteaga's clothing to see if he was armed.[8] *Terry*, 392 U.S. 30.

I conclude that the officers could lawfully pat down the exterior of Arteaga's clothing to search for weapons. No physical evidence was obtained during their frisk.

### C.  The Officers Could Search Arteaga as a Search Incident to Arrest.

Probable cause exists where "officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Ramirez*, 560 F.3d at 1023 (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)). "A determination as to whether probable

---

[7] The defense describes this as the "second frisk" because it contends that Arteaga was frisked by Sarcos in the street immediately after he was pushed to the ground. *See* Reply at 9. But this contention is belied by the officers' body-worn camera footage and their sworn declarations. *See* O'Brien Decl. ¶ 10 ("I did not conduct a pat-down search of [Arteaga]."); Sarcos Decl. ¶ 11 (explaining that other officers frisked him); Ex. F; Ex. G.

[8] While Custodio characterized the frisk as a pat-down search that was limited to Arteaga's outer clothing, *see* Custudio Decl. ¶ 4, the bodyworn camera footage tells a different story. Sarcos's body-camera, for instance, shows that several officers pinned Arteaga down and repeatedly lifted up his shirt. Ex. G at 1:20–2:08. True, the officers did not find the gun, the white powder, or the cash, which was later uncovered on Arteaga's person. But the invasive nature of the search is not lessened by the officers' ineffectiveness. In any event, though, the officers did not find or seize any evidence during the sidewalk search.

16

cause exists requires a 'practical, common-sense' decision based on the totality of the circumstances, including the veracity, basis of knowledge and reliability of the information provided by informants." *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 214 (1983)).

Almost immediately after the frisk on the sidewalk had concluded, Arteaga admitted to driving a vehicle involved in a collision; soon after that, Delaney and Kasper confirmed that the BMW was the vehicle involved in the road rage shooting; a bystander connected Arteaga to the vehicle; Arteaga gave a series of false names to the officers; and Arteaga was found with a gun on his person. Custodio Decl. ¶¶ 6, 7; Sarcos Decl. ¶ 11; Delaney Decl. ¶ 8; Kasper Decl. ¶ 14; O'Brien Decl. ¶¶ 12–14; Hargreaves Decl. ¶ 3. Reasonable suspicion had ripened into probable cause at least by the discovery of the gun.

Because the officers had probable cause to believe that Arteaga was the road rage shooter, they could lawfully search his person as an incident of arrest. *See Arizona v. Gant*, 556 U.S. 332, 339 (2009) (explaining that a search incident to arrest includes the arrestee's person and area within his immediate control). The warrantless search of his person thus comported with the Fourth Amendment.

### D. Arteaga Lacks Standing to Challenge the Search of the BMW.

The defense also challenges the search of the BMW. But because Arteaga has not shown that he had a reasonable expectation of privacy in the BMW, he lacks standing to challenge the lawfulness of the search.

Whether a warrant to search the BMW was required is a separate question from the one that I address here, which is whether the person claiming a constitutional violation "has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978)). "Answering that question requires examination of whether the person claiming the constitutional violation had a 'legitimate expectation of privacy in the premises' searched." *Id.* (quoting *Rakas*, 439 U.S. at 143). In other words, "[t]o establish standing to challenge the legality of a search or seizure, the defendant bears the burden of proving that he had a 'legitimate

17

1     expectation of privacy' in the items seized or the area searched." *United States v. Licea*, 166 F.3d

2     1219 (9th Cir. 1999) (internal quotation omitted).

3         "As a general rule, only the owner of the vehicles or an individual with a legitimate

4     privacy interest in the vehicles may challenge an allegedly illegal search." *United States v.*

5     *Wanless*, 882 F.2d 1459, 1462 (9th Cir. 1989) (internal citation omitted) (cleaned up); *see also*

6     *United States v. Kostov*, 930 F.2d 30 (9th Cir. 1991) (same). The Court has explained that "a

7     person present in a stolen automobile at the time of the search may [not] object to the lawfulness

8     of the search of the automobile." *Byrd*, 138 S. Ct. at 1529 (quoting *Rakas*, 439 U.S. at 141 n.9).

9     This is because "[n]o matter the degree of possession and control, the car thief would not have a

10    reasonable expectation of privacy in a stolen car." *Id.* On the other hand, an unauthorized driver

11    of a rental car, for instance, "may have standing to challenge a search if he or she has received

12    permission to use the car." *United States v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006).

13        Because Arteaga bore the burden of showing that he had a reasonable expectation of

14    privacy in the car, he needed to put forward evidence demonstrating that he lawfully possessed the

15    BMW at the time of the search. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980) (explaining that

16    the defendant bears the burden of proof showing that he has standing to challenge the search);

17    *Byrd*, 138 S. Ct. at 1524 (holding that lawful possession of vehicle establishes reasonable

18    expectation of privacy). Arteaga has not done so. His efforts to challenge the constitutionality of

19    the BMW search by questioning the police canine's reliability are fruitless because Arteaga has

20    not shown that he has standing to challenge the search.

21    **V.    EVIDENTIARY HEARING**

22        The defense seeks an evidentiary hearing to address discrepancies in O'Brien's and

23    Sarcos's declarations as compared to the original police reports and to challenge the reliability of

24    Cooper, the police canine that purportedly alerted to the presence of drugs while conducting a

25    sniff-test outside of the BMW. Reply at 14. An evidentiary hearing is not needed in light of the

26    robust evidentiary record before me.

27        "An evidentiary hearing on a motion to suppress need be held only when the moving

28    papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to

1 conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). The parties have submitted ample evidence regarding what happened during the investigatory detention on November 9, 2021. I have discussed above the discrepancies in the evidence identified by the defense and explained why they are not material. After carefully considering seven declarations by SFPD officers, body-worn camera footage of six officers, nearby surveillance footage, and multiple dispatch calls, I am confident that O'Brien and Sarcos had reasonable suspicion to detain Arteaga when they saw him by the side of the BMW, and that their reasonable suspicion ripened into probable cause during the pendency of the encounter.

## CONCLUSION

For the foregoing reasons, I **DENY** the defense's motion to suppress the evidence arising from the seizure and subsequent searches of Arteaga on November 9, 2021.

**IT IS SO ORDERED.**

Dated: November 21, 2022



William H. Orrick
United States District Judge